IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISRICT OF PENNSYLVANIA

KATRINA WILLIAMS McCOY          :
                                :
        Plaintiff,              :
                                :
    v.                          :
                                :        Civil Action No. 02 CV 5125
STARZ ENCORE GROUP              :
a/k/a ENCORE MEDIA COMPANY      :
                                :
        Defendant.              :

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(b) Defendant Starz Encore Group moves for summary judgment and, for the reasons set forth below and in Defendant's supporting brief filed contemporaneously herewith, respectfully requests that Plaintiff's complaint be dismissed in its entirety.

1.      Plaintiff is a former employee of Starz Encore Group.  In this lawsuit, Plaintiff alleges that she was discriminated against on the basis of her race, African American, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

2.      Plaintiff cannot succeed on her claim.  Plaintiff's race discrimination claim fails because Plaintiff has failed to establish her *prima facie* case and has failed to demonstrate that Defendant's legitimate non-discriminatory reason for her termination is pretextual.

WHEREFORE, Defendant respectfully requests that the Court enter summary judgment dismissing all of Plaintiff's Complaint.

Respectfully submitted this 14th day of July, 2003

ELZI PRINGLE GURR & STACY

By: _____
David H. Stacy
950 17th Street, Suite 1875
Denver, CO  80202
(303) 623-9111

MONTGOMERY MCCRACKEN, WALKER
& RHOADS, LLP

By: _____
L. Kristen Blanchard, Esq.
123 Broad Street, Avenue of the Arts
Philadelphia, PA 19109
(215) 772-7491

Attorneys for Defendant Starz Encore Group

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July, 2003 a true and correct copy of the above and foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was served by U.S. mail, first-class postage prepaid, addressed to the following:

Sharon Gilbert Timm, Esq.
350 South Main Street
Penn's Court – Suite 111
Doylestown, PA  18901

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISRICT OF PENNSYLVANIA

KATRINA WILLIAMS McCOY       :
      :
    Plaintiff,       :
      :
    v.       :
      :     Civil Action No. 02 CV 5125
STARZ ENCORE GROUP       :
a/k/a ENCORE MEDIA COMPANY       :
      :
    Defendant.       :

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. Proc. 56(b) and L.R. 7.1(c), Defendant Starz Encore Group

["Defendant" or "Starz"] respectfully submits its Brief in Support of its Motion for Summary

Judgment.

## I.    INTRODUCTION

Plaintiff alleges that she was discriminated against on the basis of her race, African

American, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* In

this case, Plaintiff produces no evidence other than her own speculation, uncorroborated by

witnesses or documentary evidence, to establish that racial bias motivated her termination.

As set forth below, Plaintiff's claim fails as a matter of law. Plaintiff has failed to

establish the required elements of her Title VII claim. Moreover, Defendant has articulated

legitimate performance reasons for her termination, which Plaintiff has failed to show are untrue

or unworthy of belief. Plaintiff has not and cannot carry her burden of proof to demonstrate that

she was intentionally discriminated against because of her race. Accordingly, Defendant

respectfully asks this Court to grant summary judgment in its favor.

II.    **STATEMENT OF UNCONTESTED FACTS**

Defendant attaches its Statement of Uncontested Facts as Ex. A.

III.    **ARGUMENT**

A.    **Summary Judgment Is Proper Because There Is An Absence Of Evidence Supporting Plaintiff's Case.**

A motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Hersh v. Allen Products Co., Inc.,* 789 F.2d 230, 232 (3d Cir. 1986). While Defendant bears the burden of showing that there is no genuine issue of material fact, it may meet its burden "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the [Plaintiff's] case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

Plaintiff bears the burden of setting forth specific facts demonstrating that a genuine issue of material fact exists, and that a reasonable fact finder could rule in her favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986). "Speculation and conclusory allegations do not satisfy this duty." *Ridgewood Bd. of Educ. v. N.E. for M.E.,* 172 F.3d 238, 252 (3d Cir. 1999). In this case, "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, [and] there is no 'genuine issue for trial.'" *Zenith Radio Corp.,* 475 U.S. at 587. As more fully set forth below, Plaintiff was terminated for her continued failure to meet the performance standards of her job. Plaintiff cannot demonstrate that Defendant discriminated against her, and summary judgment is appropriate in this case.

2

**B.    Plaintiff Has Failed to Establish Her Prima Facie Case.**

Title VII prohibits "discrimination based on race, color, religion, sex, or national origin."

42 U.S.C. § 2000e-16(a).  Because Plaintiff has not alleged or brought forth any direct evidence

of discrimination, her claim must be assessed under the burden-shifting framework set forth by

the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  Hence, Plaintiff

must first establish her *prima facie* case: (1) that she is a member of a protected class; (2) that

she is qualified for the position; (3) that she was discharged or suffered an adverse employment

action; and (4) the circumstances raise an inference of discrimination.  *Geraci v. Moody-Tottrup,*

*Int'l, Inc.,* 82 F.3d 578, 580 (3d Cir. 1996).  If Plaintiff makes out her *prima facie* case, "the

burden shifts to defendant to articulate a legitimate non-discriminatory reason for the plaintiff's

termination.  If defendant articulates such a reason, the plaintiff then must prove that the facially

legitimate reason was a pretext for a discriminatory motive."  *Rhett v. Carnegie Ctr. Assocs. (In*

*re Carnegie Ctr. Assocs),,* 129 F.3d 290, 295 (3d. Cir. 1997) (*citing Texas Dep't of Community*

*Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981)), *cert. denied* 524 U.S. 938 (1998).

**1.    Plaintiff cannot demonstrate that she was "qualified for her position."**

As set forth below, Plaintiff's performance in her job was unacceptable, and failed to

improve even after Plaintiff was given an Action Plan and an opportunity to correct her

deficiencies.  *See* § III (B)(3), *infra.*  As stated by this Court, Plaintiff must establish that she

"performed her job satisfactorily" in order to establish her *prima facie* case for discrimination.

*Stove v. Philadelphia Sch. Dist.,* 58 F. Supp.2d 598, 601 (E.D. Pa. 1999), *aff'd* 216 F.3d 1077

(3d Cir. 2000), *cert. denied.*

In this case, Plaintiff does allege that she performed some aspects of her job

3

satisfactorily.[1]  However, she admits that she did not fulfill the requirements of the Action Plan

she was given to complete.[2]  She also admits that she had difficulty with understanding the

budget,[3] completing her expense reports,[4] and understanding SEG products and sales strategies,[5]

all of which were basic and essential requirements of her job.[6]

By her own testimony, Plaintiff cannot establish that she performed the duties of her job

satisfactorily.  Her direct supervisor testified that her performance was deficient.[7]  Accordingly

she has failed to establish the second element of her *prima facie* case.  *See Stove,* 58 F. Supp.2d

at 604 (granting summary judgment for defendant because, *inter alia,* plaintiff failed to establish

satisfactory job performance); *see also Gaspar v. Merck and Co.,* 118 F. Supp.2d 552 (E.D. Pa.

2000) (summary judgment granted because, *inter alia*, no evidence that Plaintiff was qualified

for position due to performance problems).

### 2.    Plaintiff has failed to establish the required inference of discrimination in her discharge.

Plaintiff likewise cannot establish the fourth element of her *prima facie* case: that her

termination took place under circumstances creating an inference of unlawful discrimination in

employment.  Plaintiff puts forth two categories of "evidence" in her failed attempt to show this

inference:  (1) alleged statements by her supervisors, Tracey Sartino and Robin Feller; and (2)

instances of alleged mistreatment by her supervisors and others in Starz management.  Neither

category of evidence suffices to demonstrate the required inference of discrimination.

---

[1] *See, e.g.,* Ex. B, p. 85, ll. 11-21; p. 86, ll. 7-12; p. 247, ll. 3-6; p. 248, ll. 14-22; p. 249, ll. 4-17; p. 254, ll. 5-12.
[2] *See* Ex. A, ¶ 11.
[3] *Id.*, p. 252, l. 23 to p. 253, l. 7.
[4] *Id.* p. 161, ll. 10-20.
[5] *Id.* p. 256, ll. 10-20.
[6] *See* Ex. C, p. 49, l. 20 to p. 50, l. 10; p. 173, l. 2 to p. 177, l. 24.
[7] *Id.*

Plaintiff alleges that Ms. Feller and Ms. Sartino made the following statements regarding

her:

- "[C]ould you [directed to an applicant for the trainer position] work for someone
  like Katrina? Take a look at her. Could you work for her?"[8]

- "Lucia [a Latina District Manager] understood . . . She knew how to do things.
  She didn't have a problem learning. I don't see why she [Plaintiff] does."[9]

- Ms. Feller stated to Plaintiff, "You cannot do this job."[10]

- Ms. Feller stated to Plaintiff, "[A client] didn't say a nice comment about you."[11]

- Ms. Feller stated to Plaintiff, "I bet [Plaintiff] does not even know how to take
  notes or remember what happened at the meeting; let's see what she can do."[12]

However, Plaintiff herself attributes no racial meaning to any of these comments. With respect

to the first statement, she objected to it because she believed she should have been the one asked

if she could work with the applicant, and not the other way around.[13]  Regarding the second

comment, she objected to the implication that she "was incompetent" while Lucia "was able to

learn."[14]  As to the last three statements, Plaintiff offered them as instances of "extreme cruelty"

by Ms. Feller towards her, but never attributed racial bias to the comments.[15]

Fundamentally, none of these comments contain any reference to race, and are

insufficient to support an inference of discrimination. *See e.g., Molthan v. Temple University –*

*of Commonwealth System of Higher Education,* 778 F.2d 955, 962-963 (3d. Cir. 1985)

---

[8] Ex. B, p. 105, l. 14-15.
[9] *Id.* p. 239, l. 24 to p. 240, l. 3.
[10] *Id.* p. 153, ll. 1-3.
[11] *Id.* p. 230, l. 22 to p. 231, l. 16.
[12] *Id.* p. 232, l. 16-21.
[13] *Id.* p. 105, ll. 15-17.
[14] *Id.* p. 239, ll. 10-12.
[15] *Id.* p. 152, l. 20 to p. 153, l. 5; p. 230, l. 19 to p. 232, l. 23

(statements containing no reference to gender do not support inference of discrimination in sex discrimination case). Such statements are, at best, evidence that Plaintiff's supervisors had concerns about her performance – nothing more.

Plaintiff also alleges numerous instances of poor treatment, which she attributes to racial bias. What Plaintiff's allegations lack in factual support she attempts to compensate for with sheer volume, and her own ideas of imputed motive. She alleges that: her managers were "hostile" and "cruel";[16] her managers failed to hire a trainer candidate to report to Plaintiff,[17] Ms. Feller was not supportive during a presentation Plaintiff made at an account review meeting; and Plaintiff believed that Ms. Sartino "didn't want [Plaintiff] near her during lunch or dinners" at the same meeting,[18] Ms. Sartino showed her wedding pictures to "everybody and skipped over [Plaintiff],"[19] Plaintiff's managers withheld information from her,[20] Plaintiff believed that she was required to take over the work of two District Managers, without the "required" support of two trainers to report to her,[21] Plaintiff alleged that she was reprimanded "every time" she attempted to use Starz corporate and administrative resources,[22] Ms. Sartino allegedly removed a marketing coordinator from Plaintiff's project because she "wanted [Plaintiff] to fail and did not want [Plaintiff] with the company because of [her] race,"[23] Ms. Sartino "did not want to be with [Plaintiff]" on a business trip,[24] and Plaintiff's managers "sabotaged" her in her job.[25]

---

[16] *Id.*, p. 105, l. 1-12; 151, l. 8 to p. 153, l. 5; p. 230, l. 15 to p. 231, l. 16; p. 232, l. 16-21; p. 233, l. 4-13.
[17] *Id.* p. 102, l. 24 to p. 104, l. 7.
[18] *Id.* p. 180, l. 5 to p. 182, l. 6.
[19] *Id.* p. 184, ll. 1-3.
[20] *Id.* p. 202, l. 21 to p. 204, l. 4; p. 206, l. 4 to p. 207, l. 9.
[21] *Id.* p. 66, l. 6 to p. 67, l. 17; p. 68, l. 2-7.
[22] *Id.* p. 132, l. 8-14; p. 218, l. 4-7.
[23] *Id.* p. 149, l. 3-20.
[24] *Id.* p. 176, l. 14-20.
[25] *Id.* p. 121, l. 21 to p. 122, l. 14; p. 97, l. 18-21; p. 123, l. 11 to p. 126, l. 21.

Even if this conduct had occurred just as Plaintiff describes, it does not create an inference of **racial discrimination.** Plaintiff has presented no witness or documentary evidence that corroborates any of these incidents, and no evidence that racial bias played a role in them. When Plaintiff's subjective beliefs about motivation are removed, what remains is no more than evidence that Plaintiff felt unsupported in her job, did not feel included in some respects at work functions, and may have had trouble getting along with her managers. The alleged conduct has no racial component or connotation. Where, as here, a plaintiff can only point to instances where she **felt** mistreated, and she **chooses** to label such treatment as racial discrimination, her own conclusory allegations are insufficient to survive summary judgment. *Cf. Billet v. CIGNA Corp.,* 940 F.2d 812, 816 (3d Cir. 1991) (plaintiff's unsupported statement that discrimination motivated employment action does not make it so).

Furthermore, in evaluating whether an inference of discrimination exists in this case, the Court should consider the fact that it was the same two managers who made the decisions to hire and fire the Plaintiff.[26] Additionally, the Court should consider that Plaintiff was hired at a significantly higher salary than that offered by the same managers to a Caucasian District Manager hired shortly after Plaintiff. *See* Ex. A. ¶ 7. While such evidence is not presumptive of a lack of discrimination, it is proper evidence for the court to consider it in weighing whether an inference of discrimination exists. *See Waldron v. SL Indus.,* 56 F.3d 491, 496 (3d Cir. 1995).

C.     **Defendant Has Produced Non-Discriminatory Reasons for Termination and Plaintiff Has Failed to Establish Pretext.**

1.     **Defendant Terminated Plaintiff for Deficient Performance.**

---

[26] *See* Ex. C, p. 33, ll. 3-20; p. 35, ll. 16-21; p. 156, l. 2 to p. 159, l. 20.

Even if Plaintiff could demonstrate a *prima facie* case for race discrimination, Defendant has met its burden of production in identifying a legitimate, non-discriminatory reason for Plaintiff's discharge:  her continued inability to meet the performance standards of her position.

Plaintiff began working for Defendant in December, 1999.  It is uncontested that seven months later she was placed on a 30/60/90 day "Action Plan" which set forth performance requirements where Plaintiff was deficient and needed to improve:

- increase knowledge of territory
- develop and implement marketing plans for Boston and Pittsburgh for the remainder of 2000;
- increase sales and product knowledge;
- understand the budget
- hire two trainers in the Philadelphia office;
- improve organizational skills.

*See* Ex. D.  Plaintiff admits that she did not meet all of the requirements of the Action Plan.  She admits that:

- she failed to compile the data required in the "key file and binder information";[27]
- she failed to compile the required information for the "key system information" sheet;[28]
- she did not complete the Prometheus model data;[29]
- she failed to meet deadlines imposed by the Action Plan.[30]

Plaintiff's contentions that she met some of the requirements of the Action Plan do not establish that her performance was legally sufficient:

[T]here is nothing unreasonable about an employer implementing an improvement plan if an employee does not meet **all** job performance expectations.  In any case, an employer can reasonably expect an employee to meet expectations more than [only part] of the time.

---

[27] Ex. B, p. 244, l. 20 to p. 245, l. 1.
[28] *Id.* p. 245, ll. 12-22.
[29] *Id.* p. 246, ll. 12-24.
[30] *Id.* p. 251, ll. 5-10.

*Bullock v. Children's Hosp.,* 71 F. Supp.2d 482, 484 n.3 (E.D. Pa. 1999) (emphasis in original) (summary judgment granted for defendant where plaintiff failed to establish *prima facie* case). Moreover, Plaintiff's subjective "disagreement with [her supervisor's] assessment of her job performance is not sufficient to raise a presumption of discrimination." *Id.* at 490. "To make out a *prima facie* case of discrimination requires more than such speculation." *Id.*

It is uncontested that two months after receiving the Action Plan, Plaintiff was given a Corrective Discipline Memorandum setting forth areas where her performance remained deficient:

- Not completing assignments on time;
- Poor planning and prioritizing of accounts and work assignments;
- Work not accurate and complete;
- Lacks good understanding of products and sales strategies;
- Has failed to deliver information due in first 30-days of the 30/60/90-day Action Plan of 7/27/00 and has not communicated progress due on the 60/90 day portion of the Action Plan.

*See* Ex. E.

Following Plaintiff's continued failure to perform, Ms. Sartino and Ms. Feller had a discussion regarding Plaintiff's performance. Ex. A, ¶ 13. At that point, the decision was made by Ms. Sartino, with Ms. Feller's approval, to terminate Plaintiff's employment. Ex. A, ¶¶ 14-15. An employer's termination of an employee for repeated performance failures is legitimate. *See Rose v. Woolworth Corp.,* 137 F. Supp.2d 604 (E.D. Pa. 2001).

### 2.    Plaintiff Has Failed to Establish Pretext.

Because Defendant has articulated a non-discriminatory reason for Plaintiff's discharge, Plaintiff must come forward with specific "evidence, direct or circumstantial, from which a fact finder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or

(2) believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action." *Jones v. School Dist.,* 198 F.3d 403, 413 (3d. Cir.

1999), (*quoting Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994)):

> the plaintiff cannot simply show that the employer's decision was wrong or mistaken,
> since **the factual dispute at issue is whether discriminatory animus motivated the
> employer** . . . Rather, the nonmoving plaintiff must demonstrate such weaknesses,
> implausibilities, inconsistencies, incoherencies, or contradictions in the employer's
> proffered legitimate reasons for its actions that a reasonable fact finder could rationally
> find them unworthy of credence.

*Id.* at 413, *quoting Keller v. Orix Credit Alliance,* 130 F.3d 1101, 1108-09 (3d Cir. 1997) (en

banc) (emphasis supplied).

Here, Plaintiff has produced no **evidence** that Defendant "proffered nondiscriminatory

reason 'did not actually motivate' [its] action." *Simpson v. Kay Jewelers,* 142 F.3d 639, 644 (3d

Cir. 1998). All Plaintiff has put forth is her own subjective belief that racial bias motivated her

termination:

> Q:    Do you believe they [Plaintiff's supervisors] were racially motivated when they
>       decided not to hire Todd? [a candidate for the open trainer position, the direct
>       report to Plaintiff].
> A:    I absolutely believe that **all** of my experiences with Starz Encore was [sic] racially
>       motivated, and specifically with Todd Goldman. Yes, I do.
> Q:    What made you believe that the situation with Todd Goldman was racially
>       motivated?
> A:    Because of the culture of the company. They did not want me there. I felt like
>       because of my race and my color, they wanted me gone, and they felt that if I – if
>       they put all the burden of doing all the work on me, that I would disappear.
> Q:    The reason they wanted you gone was because of your race –
> A:    Because of my race. . . .

Ex. B p. 102, l. 24 to p. 103, l. 16 (emphasis supplied). Throughout her deposition, Plaintiff's

testimony follows a similar pattern: she states her feeling that discrimination motivated some

alleged mistreatment, but presents no factual evidence substantiating her belief. Plaintiff has

identified no witness or document to substantiate her allegations of bias. In order for this kind of indirect evidence to show pretext, it "must be enough to support a **reasonable** inference that the reasons given for the employment decision are pretextual. Merely reciting that [a discriminatory motive] was the reason for the decision **does not make it so**." *Billet,* 940 F.2d at 816 (emphasis in original in part, supplied in part). Plaintiff's own subjective belief that she should not have been terminated, or that racial bias motivated anyone's treatment of her, is not evidence of discrimination. *See Gaspar,* 118 F. Supp.2d 552 (summary judgment for defendant granted where no pretext; employee had history of consistently poor performance; and no contradictory evidence existed except employee's own disagreement with evaluations).

### 3. Plaintiff Has Failed to Produce Indirect Evidence of Pretext.

Likewise, Plaintiff cannot show pretext because there is no evidence that demonstrates that Defendant has previously discriminated against her, or has discriminated against other employees within a protected class, or that Defendant has treated more favorably similarly situated persons not within a protected class. *See Fuentes,* 32 F.3d at 765.

#### a. Plaintiff cannot produce any evidence that Defendant discriminated against her previously.

As set forth above, Plaintiff alleges that her supervisors and others mistreated Plaintiff prior to her termination. *See* § III(B)(2), *supra.* Even if every allegation of mistreatment Plaintiff puts forth is true, she cannot identify evidence showing racial bias, as these examples from her deposition attest:

Q:    Is there anything specific that you can point to that makes you think the decision not to hire Todd Goldman was racial?

A:    The mere fact that it was not justified for the [sic] them not to hire him. The only purpose for them not hiring Todd Goldman is so that I can continue having a

tremendous amount of work load, more than my white female counterparts, and it
was extremely difficult to take on that burden.

Q:    How do you know that was the only reason?

A:    How do I know that was the only reason, it was the only reason. It's the culture
of the company . . .

Ex. B, p. 103, l. 22 to p. 104, l. 12.

Q:    What makes you think that that [the length of time it took to hire a trainer to
report to Plaintiff] was intentional sabotage by someone?

A:    Because we did not get a trainer. We were not able to take the time and work
together as a group. It was not a – the company knows that I needed a trainer; I
need a trainer.

Q:    Couldn't there have been a reason other than sabotage?

A:    What would that be?

Q:    You can't think of any other reason?

A:    They didn't want me there because of my race, specifically.

* * *

Q:    What makes you think that the company not providing you more people to help
with the hiring process was racially motivated?

A:    It's not a one-person job. The company knows that. . .

*Id.* p. 126, l. 7 to p. 127, l. 1. Plaintiff's deposition is replete with similarly cagey responses,

where she does not answer the question posed, but instead responds with broad allegations of

discrimination without any facts. Again, it should be noted that no witness deposed or document

produced in this case substantiates Plaintiff's allegations of bias. Her evasiveness cannot

disguise the reality that she has **no facts** supporting her allegations of racial bias.

Plaintiff's reference to innocuous comments by her supervisors are unavailing to show

pretext for the same reason that they do not show an inference of discrimination in this case. *See*

§ III(B)(2), *supra.* Moreover, "there is no evidence whatsoever that these comments were

linked, temporally or otherwise, to the decision to fire plaintiff." *Rose,* 137 F. Supp.2d at 610

(racist remarks including: African American community a "baby factory," African Americans

incapable of thinking analytically, and instructions to African American plaintiff not to talk to

12

white women found insufficient evidence of pretext). *See also Bullock,* 71 F. Supp.2d at 486

(supervisor's remarks that people from United Arab Emirates are "ignorant" and "should speak

American" inadequate to constitute pretext evidence); *Burks v. City of Philadelphia,* 950 F.

Supp. 678, 686-87 (E.D. Pa. 1996) (disparaging remarks about African Americans generally not

direct evidence of employment discrimination).

In the above-cited cases, the courts were confronted with blatantly racist remarks, and

found them insufficient to constitute pretext evidence. In comparison, the remarks Plaintiff

relies upon contain no direct or indirect reference to race. It is obvious that statements such as

"[y]ou cannot do this job," "[a client] didn't say a nice comment about you," "I bet [Plaintiff]

does not even know how to take notes," etc., are "not sufficient to create a genuine issue of fact

with regard to pretext." *Rose,* 137 F. Supp.2d at 610. This is particularly true where there is no

evidence linking these statements to Plaintiff's termination. "Stray remarks . . . by

decisionmakers unrelated to the decision process are rarely given great weight . . ." *Ezold v.

Wolf, Block, Schorr & Solis-Cohen,* 983 F.3d 509, 545 (3d Cir. 1992).

Moreover, it is uncontested that Plaintiff never reported these comments or her

"concerns" about racial discrimination to anyone in management, or to the Human Resources

Department at Starz. In fact, when asked whether she had reported her concerns, Plaintiff

responded, **"I had not been discriminated against,** so I just expressed it to my team member

[rather than reporting it to Human Resources]." Ex. B, p. 145, ll. 20-22 (emphasis supplied).

Clearly, Plaintiff's own belief that she suffered from racial bias is ambivalent, and cannot

support a finding of pretext.

      **b.**      **Plaintiff has failed to establish that Defendant discriminated against other persons in a protected class.**

In her deposition, Plaintiff described the "culture" of Defendant as one in which African American employees are not welcomed:

- Starz "typically does not do well with black females. It's a culture thing." Ex. B, p. 184, ll. 20-21.

- "The history – the retention of keeping black employees of that company, you know, there's – obviously, there's some numbers. It's extremely poor. It's very well-known throughout the industry about Starz Encore's history with black employees. They don't want black employees there. They keep them there for a short period of time, and then they terminate them." *Id.* p. 104, ll. 17-24.

Plaintiff identifies no evidence substantiating these sweeping condemnations. These allegations are not corroborated by any witnesses, or by any documentary evidence. Plaintiff's enthusiasm in criticizing Defendant does not compensate for the complete absence of evidence to substantiate her allegations.

In a futile attempt to bolster this point, Plaintiff references former Starz employees who allegedly were terminated because of their race: Susan Lewis, an African American woman who was a Regional Vice President;[31] Dee Filey Davis, an African-American woman;[32] and former Manager of Production Lee Gashmaxey, an African American woman.[33]

However, by Plaintiff's own testimony, she has no foundation for her claim that these women were terminated because of their race:

Q:     If she [Ms. Lewis] was terminated, do you know why?
A:     Because of her race. I would say that Susan was terminated because of her race.

---

[31] Ex. B, p. 108, l. 23 to p. 109, l. 8.
[32] *Id.* p. 294, l. 13 to p. 295, l. 13.
[33] *Id.* p. 295, l. 18 to p. 296, l. 12.

Q:    Do you have any firsthand knowledge of the circumstances of her leaving the
      company?
A:    **I don't have any** – I was not employed at the company upon Susan Lewis's
      termination. . .
              ***
Q:    Has anyone told you the circumstances of her leaving, specifically?
A:    **No.**
Q:    Do you know of any problems that she had at the time she left, problems with the
      company or the company had with her?
A:    **No.**

Ex. B, p. 110, l. 15 to p. 111, l. 10 (emphasis supplied).  In fact, Plaintiff admitted that Ms. Lewis

was promoted while Plaintiff was still employed with Defendant:

Q:    In fact, while you were there, Susan was a director in the Philadelphia office and
      then was promoted to vice president?
A:    That's correct.
Q:    Why do you think they would promote her to an officer position if they were
      biased against her because of her race?
A:    . . . I think out of desperation of needing to fill the position to get somebody to
      assume that role . . . that's why Susan Lewis was handed that position.

*Id.* p. 111, l. 23 to p. 112, l. 12.

Regarding Ms. Davis and Ms. Gashmaxey, Plaintiff testified, "by the way, I don't know

either one of those ladies." *Id.* p. 296, ll. 22-23.  Plaintiff's allegations regarding all three of

these former African American employees are utterly without factual support.

> **c.    Plaintiff cannot show that Defendant treated similarly situated
>          persons, not in a protected class, more favorably than Plaintiff.**

Finally, Plaintiff cannot identify any similarly situated employees who were treated more

favorably than Plaintiff. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 258

(1981) ( *citing McDonnell Douglas,* 411 U.S. at 804) (employee can demonstrate pretext by

showing similarly situated employees "were not treated equally").  "To be deemed 'similarly

situated' the individuals with whom a plaintiff seeks to be compared must have 'engaged in the

15

same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Bullock,* 71 F. Supp.2d at 489. Plaintiff cannot identify a single similarly situated Starz employee whose performance was poor and who was **not** terminated.

In her deposition, Plaintiff identified two categories of individuals who allegedly received favorable treatment as compared to Plaintiff: (1) a Caucasian trainer, Melissa Diehlman, who left Defendant shortly after Plaintiff was hired;[34] and (2) Caucasian District Managers Julie Pieper, Colleen Willkom and Noel Haberman.[35] However, Plaintiff has not established any of these individuals as similarly situated to herself, and their alleged treatment by Defendant is not legally relevant.

Ms. Diehlman was a woman who reported to Plaintiff in the early months of her employment.[36] She was Plaintiff's subordinate, and her job was clearly different from Plaintiff's. Obviously, she had a different direct supervisor than Plaintiff, in that Ms. Diehlman reported to her. Moreover, Plaintiff has identified no evidence that Ms. Diehlman's job performance was – like Plaintiff's – unacceptable. Plaintiff has identified no evidence that Ms. Diehlman was subject to an Action Plan, Corrective Discipline Memorandum, or any other disciplinary measure. In short, Ms. Diehlman is clearly not similarly situated to Plaintiff. "[A] comparison among non-similarly-situated employees does not establish that an employer has discriminated against the plaintiff." *Bullock,* 71 F. Supp. 2d at 490.

---

[34] *Id.* p. 240, l. 17-19.
[35] *Id.* p. 96, l. 5-21; p. 150, l. 14 to p. 151, l. 12; p. 213, l. 19 to p. 214, l. 9.
[36] *Id.* p. 28, l. 19 to p. 30, l. 7.

The three Caucasian District Managers Plaintiff identifies shared the same job title as Plaintiff. Regarding these individuals, Plaintiff claims that they had lighter work loads,[37] trainers to assist them,[38] support from management,[39] and were "never given unrealistic expectations."[40]

However, Plaintiff admitted that she only observed the treatment received by these individuals by overhearing telephone calls between Ms. Sartino and two of them [Ms. Haberman and Ms. Willkom].[41] She admitted she had "no idea" how many call centers Ms. Haberman had,[42] while admitting that the number of call centers would affect a District Manager's work load.[43] She admitted that she did not recall if there were open trainer positions under any of these District Managers, saying, "I can't assume. I mean, that would be like guessing. I have no idea."[44] In fact, Plaintiff admitted that she "didn't know what anybody else was doing" in response to a question comparing her performance with that of the other District Managers.[45]

Moreover, there is no evidence that any of these individuals was comparable to Plaintiff in terms of their performance. She has identified no evidence that these women were given an Action Plans. There is no evidence that they were given Corrective Discipline Memorandums. Plaintiff has produced no evidence, other than her "own unique interpretation of [her comparators'] job description[s]" to establish these individuals as similarly situated. *Stove,* 58 F. Supp.2d at 602. Such "evidence" in legally insufficient. *Id.*

---

[37] *Id.* p. 103, l. 22 to p. 104, l. 7.
[38] *Id.* p. 86, l. 19 to p. 87, l. 17; p. 96, l. 5-8, p. 127, l. 7-10.
[39] *Id.* p. 96, l. 9-21; p. 150, l. 14 to p. 151, l. 12; p. 213, l. 19 to p. 214, l. 11.
[40] *Id.* p. 214, l. 12-22.
[41] *Id.* p. 215, l. 3-9.
[42] *Id.* p. 224, l. 4-14.
[43] *Id.* p. 224, l. 18-22.
[44] *Id.* p. 90, l. 10-13.
[45] *Id.* p. 84, l. 14 to p. 85, l. 9.

Even if the decision to terminate Plaintiff was wrong or based upon incorrect information, the question before this court is not whether Defendant is "wise, shrewd, prudent, or competent" in its employment practices. *Fuentes,* 32 F.3d at 765. Indeed, it is not the duty of a court to analyze the sufficiency or propriety of the discharge decision. The court does "not sit as a super-personnel department that re-examines an entity's business decisions." *Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 332 (3d Cir. 1995). Rather, the Court must determine whether the reasons proffered by Defendant for Plaintiff's discharge were truthful reasons. "We recognize[] that an employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason." *Id.*

## IV.    CONCLUSION

The ultimate burden of proof in discrimination cases "remains at all times with the plaintiff." *Id.* Defendant does not have the burden of proving the absence of discriminatory intent. *Board of Trustees v. Sweeney,* 439 U.S. 24 (1978). Here, Plaintiff's claim fails because she has presented no factual evidence that Defendant "intentionally discriminated" against her because of her race. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253 (1981). She has produced nothing but her own speculation and opinion that racial bias motivated her termination.

In this case, the undisputed facts are clear: Plaintiff's performance became deficient shortly after she began working at Defendant. She was given the opportunity to improve her performance, and she failed to do so. Consequently, she was terminated.

Because Plaintiff can identify no evidence other than a "metaphysical doubt as to the material facts" in this case, her claim should not be allowed to proceed. *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Accordingly, summary judgment is proper in this case.

Respectfully submitted this 14th day of July, 2003

ELZI PRINGLE GURR & STACY

By: _____

David H. Stacy
950 17th Street, Suite 1875
Denver, CO 80202
(303) 623-9111

MONTGOMERY MCCRACKEN, WALKER
& RHOADS, LLP

By: _____

L. Kristen Blanchard, Esq.
123 Broad Street, Avenue of the Arts
Philadelphia, PA 19109
(215) 772-7491

Attorneys for Defendant Starz Encore Group

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of July, 2003 a true and correct copy of the above and
foregoing **DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT** was served by U.S. mail, first-class postage prepaid, addressed to the following:

Sharon Gilbert Timm, Esq.
350 South Main Street
Penn's Court – Suite 111
Doylestown, PA  18901

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISRICT OF PENNSYLVANIA

KATRINA WILLIAMS McCOY           :
                                 :
        Plaintiff,               :
                                 :
        v.                       :
                                 :          Civil Action No. 02 CV 5125
STARZ ENCORE GROUP               :
a/k/a ENCORE MEDIA COMPANY       :
                                 :
        Defendant.               :

**DEFENDANT'S STATEMENT OF UNCONTESTED FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Starz Encore Group ["Defendant" or "Starz"] respectfully submits its

Statement of Uncontested Facts in Support of its Motion for Summary Judgment.

1.      Plaintiff sent a letter to Starz Vice-President Robin Feller on October 21, 1999, in

application for a District Manager position with Defendant. McCoy Deposition, Ex. B, p. 306, l.

17 to p. 307, l. 21.

2.      Starz Director Tracey Sartino interviewed her for the District Manager position. Sartino

Deposition, Ex. C, p. 22, l. 20 to p. 23, l. 19.

3.      Plaintiff was also interviewed by Ms. Feller. *Id.* p. 24 ll. 5-17.

4.      Ms. Sartino made the decision to hire Plaintiff, and Ms. Feller called her with the offer.

Ex. B, p. 108, ll. 3-14.

5.      The starting salary offered to Plaintiff was $60,000. Ex. C, p. 33, l. 24.

6.      This salary was near the top of the range of $40,000 to $65,000 salaries offered to new

District Managers. *Id.* p. 34, ll. 2-9.

7.      This salary was $5,000 to $10,000 more than the salary offered to a Caucasian District

**Exhibit A**

Manager Colleen Willcom, who was hired shortly after Plaintiff. *Id.* p. 28, l. 16 to p. 29, l. 10; p. 35, ll. 4-7.

8.      Plaintiff accepted the job offer, and began work as District Manager for the East Coast region of Starz on December 30, 1999. Ex. B, p. 9, ll. 7-14; p. 286, ll. 2-5.

9.      Ms. Sartino was Plaintiff's direct supervisor when she worked at Defendant. *Id.* p. 17, l. 24 to p. 18, l. 2.

10.     On July 26, 2000, Plaintiff was given an Action Plan ["the Action Plan"]. *Id.* p. 242, l. 23 to p. 243, l. 7; *See* Action Plan, Ex. D.

11.     Plaintiff did not meet all of the improvement objectives and deadlines set forth in the Action Plan. *Id.* p. 244, l. 20 to p. 245, l.1; p. 245, ll. 12-22; p. 246, ll. 12-24; p. 251, ll. 5-10.

12.     On September 28, 2000, Plaintiff was given a Corrective Discipline Memorandum. *Id.* p. 254, ll. 16-19. *See* Corrective Discipline Memorandum, Ex. E.

13.     Following expiration of the 90-day portion of the Action Plan in October, 2000, Ms. Sartino and Ms. Feller had a discussion regarding Plaintiff's job performance. Ex. C, p. 156, ll. 2-12

14.      Ms. Sartino decided that Plaintiff would have to be terminated. *Id.* p. 156, ll. 8-14.

15.     Ms. Feller supported Ms. Sartino's decision. *Id.* p. 158, ll. 20-21.

16.     Plaintiff was terminated. *Id.* p. 160, ll. 1-6.

17.     Plaintiff's last date of employment was November 15, 2000. Ex. B, p. 286, ll. 6-8.

# EXHIBIT B

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4    KATRINA WILLIAMS McCOY,      : CIVIL ACTION

5              Plaintiff,         : NO. 02-CV-5125

6          vs                    :

7    STARZ ENCORE GROUP a/k/a     :

8    ENCORE MEDIA COMPANY,        :

9              Defendant.         :

10

11                       - - -
                THURSDAY, APRIL 3, 2003
12                       - - -

13

14          Oral deposition of KATRINA WILLIAMS

15   McCOY taken at the law offices of MONTGOMERY,

16   McCRACKEN, WALKER & RHOADS, LLP, 123 South Broad

17   Street, Avenue of the Arts, Philadelpia,

18   Pennsylvania, on the above date, beginning at 10:04

19   a.m., before Susan Lauer, Court Reporter-Notary

20   Public, there being present.

21                       - - -

22
              LIPBERTY DEPOSITION SERVICES
23                 407 LODGES LANE
         ELKINS PARK, PENNSYLVANIA  19027
24                 (215) 782-9960

92086ce0-73cb-11d7-b67d-444553540000

**Exhibit B**

```
 1                       APPEARANCES

 2

 3   LAW OFFICES OF SHARON GILBERT TIMM
     BY:  SHARON GILBERT TIMM, ESQUIRE
 4   350 South Main Street
     Penn's Court, Suite 111
 5   Doylestown, Pennsylvania  18901
     (215) 489-0179
 6   Counsel for Plaintiff

 7
     LAW OFFICES OF ELZI PRINGLE & GURR
 8   BY:  DAVID H. STACY, ESQUIRE
     950 Seventeenth Sreet
 9   Suite 1875
     Denver, Colorado  80202
10   (303) 623-9111
     Counsel for Defendant
11

12   LAW OFFICES OF MONTGOMERY, McCRACKEN,
     WALKER & RHOADS, LLP
13   BY:  L. KRISTEN BLANCHARD, ESQUIRE
     123 South Broad Street
14   Avenue of the Arts
     Philadelphia, Pennsylvania  19109
15   (215) 772-7491
     Co-Counsel for Defendant
16

17   ALSO PRESENT:  SHERYL ANDERSON

18                    - - -

19

20

21

22

23

24
```

1        Q.       In your whole life?

2        A.       As far as I recall, I've never been

3    discriminated against.

4        Q.       Are you limiting that to employment?

5        A.       As far as I recall, I've never been

6    discriminated against at all.

7        Q.       Now, as I understand it, you began

8    your employment with Starz Encore Group on

9    December 30, 1999; is that right?

10       A.       Yes.

11       Q.       You were hired as a district

12    manager?

13       A.       I was hired as district manager for

14    the East Coast region, yes.

15       Q.       What were your job responsibilities

16    as a district manager?

17       A.       As a district manager for Starz

18    Encore Group, I was responsible for the --

19    overseeing trainers, two trainers who would go into

20    the systems, the AT&T cable systems to do product

21    knowledge training.

22                I was also responsible for the

23    movie-based incentives with the systems.  I was

24    responsible, primarily, for acquisitions, growing

```
 1    either by trainers or by you?

 2            A.      Can you reword that question,

 3    please?

 4            Q.      Sure.  You were part of the AT&T

 5    team, correct?

 6            A.      Yes, I was.

 7            Q.      And the AT&T team had two directors,

 8    and a number of district managers working for each

 9    of those directors; fair enough?

10            A.      Yes.

11            Q.      As a general matter, that was true?

12            A.      Can you repeat that last point you

13    made?

14            Q.      The general structure consisted of

15    two directors, and each of the directors had part of

16    the country geographically?

17            A.      Yes.

18            Q.      And each of the directors had a

19    number of district managers who they supervised?

20            A.      Yes.

21            Q.      And you were one of those district

22    managers on the AT&T team?

23            A.      Yes.

24            Q.      And your director was Tracey
```

1    Sartino, right?

2          A.      Yes.

3                 MR. STACY:  That's Tracey, E-Y,

4          S-A-R-T-I-N-O.

5    BY MR. STACY:

6          Q.      And the organizational structure

7    included a vice president above Tracey whose name

8    was Robin Feller; is that right?

9          A.      A regional vice president.

10         Q.      Right.

11         A.      Whose name was Robin Feller.

12         Q.      Okay.  So the trainings that were

13   done in the field at the systems' offices on the

14   AT&T team that worked for Tracey, on Tracey's side,

15   were done by trainers and in some cases by you, but

16   no one else; is that right?

17         A.      I need you to repeat that, please.

18         Q.      You said that no district managers

19   did any trainings except you, right?

20         A.      I never saw.  You asked me if I

21   saw.  I never saw any district managers do any

22   trainings.  I can only speak of my experience.

23         Q.      And I apologize.  That's exactly

24   what I asked you, and I stand corrected.  Let me ask

1      Q.      By June?

2      A.      I would say yes.  As far as I can

3  recall, I would say yes.

4      Q.      By June.  That's what you said.

5      A.      Yes.

6      Q.      My question now is, how long before

7  June, if at all, did you have that thorough working

8  knowledge?  And you don't have to give me a date.

9  You can say after three months' work I thought I had

10  a full working knowledge or the first several months

11  or by spring.  Just describe it honestly, to the

12  extent you can remember.

13      A.      Yeah.  I would say before June.

14  Definitely before June, I knew the channels.  I knew

15  the product before June.

16      Q.      Can you be any more precise than

17  that?  In fact, let me help you a little bit.

18      A.      Okay.

19      Q.      Approximately March 1, Melissa

20  Diehlman came on board as your second trainer.  Do

21  you recall that?

22      A.      Yes.

23      Q.      By the time she arrived, did you

24  have a thorough working knowledge of the products

1    you were responsible for?

2          A.        I want to say I don't know -- let me

3    answer the question prior to this. Melissa Diehlman

4    did come on board. The exact date of March 1, I

5    can't confirm that. I don't remember specifically

6    at this time what date Melissa Diehlman did come on

7    board.

8          Q.        I'm asking you to accept, for the

9    sake of the question, that the records reflect that

10   it was on or about the 1st of March, which would be

11   two months into your employment.

12                   Given the fact that it was your

13   responsibility to supervise her, I'm wondering if

14   you had what you consider to be a full working

15   knowledge of the products you were responsible for

16   at that time or was it sometime later that you felt

17   you had the full working knowledge?

18         A.        Can we go back to the previous

19   question? I believe Melissa Diehlman started in

20   February. I don't believe that Melissa Diehlman

21   started on or about March 1.

22         Q.        Why don't we do this, regardless of

23   when she started, when she arrived and you took

24   responsibility for supervising her, did you then

1    have a full working knowledge of the products that

2    you were required -- that you were responsible for

3    and that she was going to have to train people on?

4        A.     When Melissa Diehlman came on board,

5    I was only with the company for probably two months,

6    and at that time, I was still in training myself,

7    learning the company's product.

8        Q.     So then it would be somewhere

9    between late February and June that you reached the

10   point of having a thorough working knowledge of your

11   products?

12       A.     When you say products, are you

13   talking specifically about the company's channels?

14       Q.     I'm talking about the products that

15   you described to me.  I asked you what products you

16   were responsible for as a district manager, and you

17   said they were channels, and you named three or four

18   of them for me.  You said you couldn't remember the

19   others.

20       A.     Okay.  Can you repeat the initial

21   question then?  I just wanted to make sure that I

22   understand you.

23       Q.     Well, you said that -- I'm using

24   your words.  You said that the trainers were

1    positions?

2          A.      Can you -- I don't understand what

3    you're saying.

4          Q.      Okay.

5          A.      That positioned two trainers.

6          Q.      What do you mean it had two

7    trainers?

8          A.      That reported to it.  That position,

9    the requirement was for two trainers.  It wasn't

10   just a luxury that the company was giving to me, it

11   was a requirement because the territories were split

12   up.  Not one trainer can perform all the trainings

13   in Boston, as well as some of the other geographical

14   areas.

15         Q.      Who told you that it was a

16   requirement?

17         A.      I was told that when I was

18   interviewed.

19         Q.      Requirement?

20         A.      In terms of the trainer?

21         Q.      Right.

22         A.      I'm going to ask you to clarify

23   because I want to make sure I'm answering your

24   question clearly.

1        Q.        Sure.  You said you were told it was

2    a requirement or you said it was a requirement that

3    there be two trainers.  And I'm asking you, did

4    someone tell you that, and if so, who?

5        A.        The regional vice president of AT&T,

6    Robin Feller; the director, Tracey Sartino; and it's

7    also documented.

8        Q.        Did they use the word, requirement?

9        A.        That position -- as far as I can

10   recall, that position has two training positions

11   that report to it.  As far as I can recall, that's

12   the terminology that was used.

13       Q.        But they did not use the word,

14   requirement or required?

15       A.        It was required, yes.  As far as I

16   recall, yes, it was required, as far as I recall at

17   this time.

18       Q.        All right.  Now, you took over the

19   Boston area from Mary O'Connor, correct?

20       A.        That is correct, yes.

21       Q.        And in addition, you were given the

22   Pittsburgh area?

23       A.        Yes.  Jeff Farr was the district

24   manager who had the Pittsburgh area, and yes, I did

1    have that.

2          Q.        Is it your position that you took

3    over the work of two district managers?

4          A.        Yes, it is.

5          Q.        Is it your position that you took

6    all of Mary's work and all of Jeff's work?

7          A.        Yes.

8          Q.        Did either of them have any

9    responsibilities other than the ones you took over?

10         A.        I don't -- if they had any other

11    responsibilities, as far as I recall, Mary O'Connor

12    only had the responsibilities I assumed.  As far as

13    I recall, when Jeff transitioned the account --

14    well, he only did the one transition with me -- he

15    was taking over another territory.

16         Q.        Then you were not aware that Mary,

17    at the time she handed off the Boston area to you,

18    also was responsible for a New York region?

19         A.        Wappingers Falls and Ossining.  I

20    acquired those.  Wappingers Falls, New York, as well

21    as Ossining, New York.  Mary lived in Wappingers

22    Falls.

23         Q.        Did you ever do any work on those

24    systems?

1   O'Connor's folder.

2          Q.      Okay, fair enough.

3                  Did you ever tell Mary O'Connor that

4   you were the best district manager on the team?

5          A.      No, I've never said that.

6          Q.      Do you believe that you provided

7   good service to the Pittsburgh system?

8          A.      Can I go back to the last question?

9          Q.      Sure.

10         A.      We were all new on our team.  We

11  were all learning our job at the same time.  How

12  could I be the best if we are all learning at the

13  same time?

14         Q.      Let me ask it this way.  Did you

15  tell Mary that you were the best or you thought you

16  were the best district manager on the team in the

17  fall of 2000 after you had been there a number of

18  months?

19         A.      I've never said that.  And if that's

20  something that Mary O'Connor said, that's a prime

21  example.  Why would anyone -- I think it's hideous.

22  That's a prime example of something wrong.

23                 Why would anyone say anything like

24  that?  It's ludicrous.  Why would I go to someone,

1    I'm the best?  No, I've never said that.

2            Q.      Did you feel that you were?

3            A.      Did I feel that I was?

4            Q.      That you were the best district

5    manager on the team.

6            A.      Did I feel that I was the best?

7            Q.      Right.

8            A.      I don't know what anybody else was

9    doing.  I certainly knew that I was working very

10   hard.  I was trying to learn a job.

11           Q.      Did you feel you did a good job

12   while you were there?

13           A.      I certainly do, yes.

14           Q.      Did you understand the Pittsburgh

15   system to be happy with your work?

16           A.      Yes, I do.

17           Q.      How about the Boston systems?

18           A.      Yes, I do.

19           Q.      Did you get along all right with

20   Jeff Levy, L-E-V-Y?

21           A.      Yes, I did.

22           Q.      In Pittsburgh, it was Maryann

23   Scarpaci; is that the correct name?  She was --

24           A.      Yes, Maryann Scarpaci.

92086ce0-73cb-11d7-b67d-444553540000

```
 1          Q.     And she was the manager of the

 2   system there?

 3          A.     She was not a manager of the system,

 4   she was one of the managers.

 5          Q.     She was your contact person?

 6          A.     Yes.

 7          Q.     And you felt you had a good

 8   relationship with her?

 9          A.     Yes.

10          Q.     And you felt that she thought you

11   were doing a good job?

12          A.     Yes.

13                         - - -

14                 (A brief recess was taken.)

15                         - - -

16   BY MR. STACY:

17          Q.     Are you ready?

18          A.     Yes.

19          Q.     Ms. McCoy, why did some district

20   managers have only one trainer assigned to them; why

21   did some have two; why did some have zero?

22          A.     I really don't know.  In terms of

23   zero, all district managers, as far as I know, had a

24   trainer.  If they had zero, it's because they were
```

1   looking to hire a trainer.

2        Q.        Was it your understanding that there

3   were periods of time where various district managers

4   would be without a trainer for that reason?

5        A.        What I understand is that I didn't

6   have two trainers.  I had one, and then she left,

7   and then I had the one who had the breakdown.  So

8   she was gone.  So I can only talk about my

9   experiences.  I can't tell you anyone else's

10  experiences in terms of why they were down trainers.

11       Q.        So you don't know whether other

12  district managers were down trainers or not,

13  correct?

14       A.        As far as, I know, I'm sure they

15  were down trainers, but they were able to work

16  together.  I don't even want to speculate.  As far

17  as I know, everybody on my team had trainers but me.

18       Q.        Did the other trainers on the team

19  do any work for you?

20       A.        We had a few trainers on the other

21  team -- on my team who would sign up to help.  It

22  wasn't consistent, though.  A lot of times they

23  would cancel trainings or come back and complain

24  about the bottleneck at Logan Airport on the issues

1    history with trainers.

2        Q.        Well, what part of Mary's territory

3    did you not get?

4        A.        I got all of Mary's territory.    I

5    got all of Mary's territory.    When I came to the

6    company, Mary went to another team, Comcast, the

7    team that the regional vice president, Miles

8    McNamee, oversaw.    So Mary O'Connor went to a whole

9    total different team.

10        Q.        Is it your assumption that Mary had

11    one or more trainers?

12        A.        I can't assume.    I mean, that would

13    be like guessing.    I have no idea.    Mary had been

14    with the company for, I think, five years.    If I'm

15    not mistaken, at least five years, I would say,

16    prior to my coming to the company.    So I don't know

17    what Mary's history with trainers or what she did

18    with trainers.

19        Q.        Was it your job -- your

20    responsibility to hire new trainers when you had

21    openings?

22        A.        It was my understanding that it

23    would be a joint effort to hire new trainers, not

24    that it was my sole and primary responsibility.    I

1    done.  So I'm only one person.  I'm not Superwoman.

2    I did everything I could, and I stayed late into the

3    evening.  It was a part of a priority list, along

4    with everything else.

5         Q.      Did other district managers take the

6    lead in contacting and screening applicants for

7    trainer positions?

8         A.      They had trainers.  I don't know

9    what other district managers did.  The only district

10   manager that I can recall that put a lot of effort

11   to it was Julie Pieper, but her director took over

12   most of her responsibilities so that she had the

13   leisure time -- or not leisure, but she had the time

14   to fill that -- well, she still didn't fill the

15   position, I think, before I left the company, as far

16   as I know.

17            But her director -- she reported to

18   Janet, the other director that reported to Robin.

19   But her director, Janet, assumed all of her

20   responsibilities so that she could look for a

21   trainer.  It helped her a lot.

22        Q.      How do you know that?

23        A.      She told me at the meetings.  I was

24   informed of that information at one of our regional

92086ce0-73cb-11d7-b67d-444553540000

```
 1    meetings.
 2            Q.      By Julie?
 3            A.      Yes.
 4            Q.      When did Julie start with the
 5    company?
 6            A.      Julie reported to Janet.  They were
 7    based in California, so I don't know.  Julie has --
 8    from what I understand, she has a background in the
 9    industry, so I don't have any -- I mean, I guess
10    Sheryl could probably give you more information on
11    when she started with the company.  I don't know.
12            Q.      Do you know if she was with the
13    company when you started?
14            A.      You know what, I don't know that.  I
15    met her at a regional meeting, and that's -- you
16    know, that's all I know is that I met her at the
17    regional meeting.
18            Q.      Now, you have claimed to the EEOC
19    that Starz Encore Group sabotaged your attempts to
20    hire a trainer, correct?
21            A.      That's correct.
22            Q.      Could you tell me the circumstances
23    that make you say that?
24            A.      Certainly.  I was promised, when I
```

1    decision to hire Todd Goldman.  I was happy.

2         Q.      Well, you knew that people could

3    change their minds, right?

4         A.      I don't understand what you're

5    trying to imply.

6         Q.      Well, since they told you that they

7    were going to hire Todd, wouldn't it be fair to say

8    they obviously changed their minds?

9         A.      It would be fair to say, from a

10   professional standpoint, if there was a decision

11   that affected my job, that someone would have

12   contacted me to let me know.  I don't know how to

13   comment on your question.

14        Q.      Well, when you say sabotage, what do

15   you mean?

16        A.      We were going to hire a trainer; it

17   didn't happen.  That's just one example.

18        Q.      What does the word, sabotage, mean

19   to you?

20        A.      What it means, sabotage?  Well, when

21   they destroy or prevent something from happening

22   through a destructive measure or any type of measure

23   that would bring harm to any situation.

24        Q.      Do you believe they were racially

92086ce0-73cb-11d7-b67d-444553540000

1  motivated when they decided not to hire Todd?

2       A.     I absolutely believe that all of my

3  experiences with Starz Encore was racially

4  motivated, and specifically with Todd Goldman.  Yes,

5  I do.

6       Q.     What made you believe that the

7  situation with Todd Goldman was racially motivated?

8       A.     Because of the culture of the

9  company.  They did not want me there.  I felt like

10  because of my race and my color, they wanted me

11  gone, and they felt that if I -- if they put all the

12  burden of doing all the work on me, that I would

13  disappear.

14       Q.     The reason they wanted you gone was

15  because of your race --

16       A.     Because of my race.  The company has

17  a history -- I'm sorry, go ahead.

18       Q.     Let me finish my question, and

19  please try to limit yourself to the question.  I

20  know you have a lot to have say, and I certainly

21  understand that.

22             Is there anything specific that you

23  can point to that makes you think the decision not

24  to hire Todd Goldman was racial?

```
 1          A.        The mere fact that it was not

 2   justified for the them not to hire him.  The only

 3   purpose for them not hiring Todd Goldman is so that

 4   I can continue having a tremendous amount of work

 5   load, more than my white female counterparts, and it

 6   was extremely difficult to continue to take on that

 7   burden.

 8          Q.        How do you know that was the only

 9   reason?

10          A.        How do I know that was the only

11   reason, it was the only reason.  It's the culture of

12   the company.  The company does not have -- was the

13   only black female district manager on my team.

14   Throughout the entire company when I was hired,

15   there was no other black female or male district

16   manager.  I was the only one.

17               The history -- the retention of

18   keeping black employees of that company, you know,

19   there's -- obviously, there's some numbers.  It's

20   extremely poor.  It's very well-known throughout the

21   industry about Starz Encore's history with black

22   employees.  They don't want black employees there.

23   They keep them there for a short period of time, and

24   then they terminate them.
```

1        Q.        Is there anything specifically that

2    you can point to that makes you think that Robin or

3    Tracey were motivated by your race when they made

4    the decision not to hire Todd?

5        A.        Just the hostility, the continual

6    hostility that I experienced, the combative-like

7    environment.  I felt like they were trying to

8    discourage Todd from wanting to come to the company

9    because of the combative way that they handled his

10   interview.

11               It was extremely hostile.  It was

12   extremely combative.  Negative things were said.

13   Robin specifically said to Todd Goldman, as I recall

14   it, could you work for someone like Katrina?  Take a

15   look at her.  Could you work for her?  He's a

16   prospective candidate.  I'm an employee.  That

17   conversation should have been directed to me.

18       Q.        Did Robin and Tracey conduct that

19   interview differently than they did other trainer

20   interviews?

21       A.        The trainer -- the only -- let's

22   see.  The interview with Melissa Diehlman that I

23   came in on the tail end presentation was not done

24   like that.  The trainer who had the breakdown and I

1    given different consideration because of the way I

2    came into the company.

3          Q.      Was it your understanding that

4    Tracey and Robin made the decision to offer you the

5    job?

6          A.      No.  It was my understanding about

7    Tracey making the decision.

8          Q.      Robin?

9          A.      You know what, I really don't know

10    who made the ultimate decision to hire me.  Robin

11    did call me up with the job offer, but I don't know

12    who specifically made the decision to hire me.  But

13    Robin Feller, the regional vice president, not

14    Tracey Sartino, called me up with an offer.

15          Q.      Do you have any reason to believe

16    that Tracey or Robin opposed your being hired?

17          A.      I don't know.  That's probably privy

18    information that I was not exposed to.  I really

19    don't know.

20          Q.      You don't either way?

21          A.      I really don't.  I wouldn't know

22    that.

23          Q.      Who was Susan Lewis?

24          A.      Susan Lewis, she was the regional

1    vice president for Comcast that took over after

2    Miles McNamee left and went to another position at

3    corporate.

4           Q.      And Susan was an African-American

5    woman, correct?

6           A.      She -- yes, she was.  She was a

7    black female who also was terminated from the

8    company.

9           Q.      I'm only asking was she an

10   African-American woman.

11          A.      Yes, she was.

12          Q.      How do you know that she was quote,

13   terminated by the company?

14          A.      I think everybody throughout the

15   industry knows that she was terminated from the

16   company.

17          Q.      How did you find that out?

18          A.      People called and asked why was she

19   terminated.  People I would run into randomly said

20   they heard she was terminated from the company.

21          Q.      What did you tell them when they

22   asked why?

23          A.      They actually knew information that

24   I had not known, and I was -- I was really

1   disappointed.

2        Q.      What did they tell you?

3        A.      That she was terminated by Starz

4   Encore, from the company.

5        Q.      For what reason?  You said they told

6   you the reasons why.

7        A.      They told that she was

8   terminated.  Let me clarify.  Everybody throughout

9   the industry knows that Susan Lewis was terminated.

10  Susan sat on the board of WIT, Women in Cable and

11  Telecommunications, I believe, and was very familiar

12  with a lot of people throughout the industry.  And

13  everybody knows that she was terminated.  Where they

14  got their information from, I don't know.

15       Q.      If she was terminated, do you know

16  why?

17       A.      Because of her race.  I would say

18  that Susan was terminated because of her race.

19       Q.      Do you have any firsthand knowledge

20  of the circumstances of her leaving the company?

21       A.      I don't have any -- I was not

22  employed at the company upon Susan Lewis's

23  termination.  I believe Susan Lewis was terminated

24  one or two months after my termination.

1        Q.       How do you know that?

2        A.       That's one of the things that I was

3   told.

4        Q.       Has anyone told you the

5   circumstances of her leaving, specifically?

6        A.       No.

7        Q.       Do you know of any problems that she

8   had at the time she left, problems with the company

9   or the company had with her?

10       A.       No.

11       Q.       Do you expect that Susan Lewis will

12   testify on your behalf in this case?

13       A.       Do I expect that?

14       Q.       Yes.

15       A.       I don't know.  I would love to ask

16   her.  She did not work on my team.  She was on the

17   Comcast team.  She had no direct -- she was familiar

18   with the amount of work that I had to do and that I

19   was doing and she did say to me that the company's

20   aware that you are doing a lot of work by yourself

21   and you know, that you need help, you need support.

22   The company is aware of that.

23       Q.       In fact, while you were there, Susan

24   was a director in the Philadelphia office and then

Page 112

1    was promoted to vice president?

2        A.    That's correct.

3        Q.    Why do you think they would promote

4    her to an officer position if they were biased

5    against her because of her race?

6        A.    From my understanding, Miles McNamee

7    needed to -- needed to move.  His family was not

8    happy with the area.  I think out of desperation of

9    needing to fill the position to get somebody to

10   assume that role, and Susan Lewis did report

11   directly to Miles McNamee, I believe that's why

12   Susan Lewis was handed that position.

13       Q.    Was there a shortage of white people

14   to give that job to?

15       A.    You're asking me to guess if there

16   was a shortage of white people?

17       Q.    Yes.  I'm wondering why you think

18   they were desperate to fill the position, so

19   desperate that they promoted an African-American?

20       A.    She was the director.  She worked

21   directly with Miles McNamee.  I believe that it

22   would be a racial decision not to promote her, if

23   they did not promote her to that position.

24       Q.    But they did, right?

1    with that they had to split me with other systems

2    because they told me, Jeff Levy and the other people

3    that we met, Mary was there.

4           Q.      Well, at any rate, the meeting that

5    you ended up having to do yourself with Jeff Levy

6    and those people went well enough that you still

7    were successful in servicing them, right?

8           A.      The meeting, I felt, was very

9    successful.  I was only three weeks old with the

10   company.  I was not with the industry.  All I could

11   do is present various questions to them, and -- but

12   I do feel, to answer your question, yes, I felt that

13   the meeting got -- we got off to a great start with

14   the meeting and the whole relationship building.

15          Q.      In terms of your feeling that your

16   attempt to hire trainers was sabotaged by the

17   company, you've told me about the Todd Goldman

18   situation.  Is there anything else that you can

19   specifically point me to that you believe was

20   sabotaged by the company?

21          A.      Well, I believe, when Tracey Sartino

22   did not show up for that meeting, that very

23   important -- Boston is like one of the top key

24   accounts.  When she did not show up, that was --

Page 122

```
 1    that was very, very devastating, and I believe that

 2    was a deliberate act on her part not to show up for

 3    that meeting with me, not to give me the support, at

 4    least calling over to the restaurant and letting the

 5    bill be sent to her.

 6               The fact that the rental car was in

 7    her name, and I could not even -- I had to go

 8    somewhere else and find a rental car.  I had never

 9    been to Boston before.  I had to find and feel my

10    way.  I had nothing.  She had all of the information

11    with her.  All I had was a few bullet points that I

12    jotted down after I made the effort.

13               That was sabotage, and it was done

14    deliberately.

15        Q.     But it had nothing to do with your

16    trying to hire a trainer, right?

17               MS. TIMM:  Counsel, I don't know

18         that she's done with her answer.

19               MR. STACY:  Well, she's giving a

20         very long answer to a question that I didn't

21         ask.  I think she just didn't hear me right.

22               MS. TIMM:  I think she's just giving

23         you an answer you don't want.  Before you

24         were saying her answers were too short, now
```

1          her answers are too long.

2                    MR. STACY:  I never said they were

3          too short.

4     BY MR. STACY:

5          Q.     Let me just clarify.

6                    MS. TIMM:  I'm asking you to allow

7          her to answer the question.

8                    MR. STACY:  I will, but we've got a

9          disconnect going here.

10    BY MR. STACY:

11         Q.     What I'm trying to ask you about is,

12    were there any other occasions where they sabotaged

13    your efforts to hire a trainer?

14         A.     To hire a trainer?

15         Q.     Yes.  I know you've got feelings

16    about that Boston incident, and that's something we

17    have talked about and we can talk about again, but

18    that didn't relate to a trainer.

19         A.     This is a new question than you

20    phrased it to me earlier.  You said other efforts of

21    sabotage.  You did not say specifically as

22    pertaining to a trainer.

23         Q.     Well, then maybe it's my fault.

24         A.     And there are other incidents.  As

1    it pertains to a trainer, the mere fact that the

2    support didn't come for hiring a trainer to the

3    end.  No effort was made on the company to give me

4    any assistance in helping to hire a trainer.

5              Just like the process that I went

6    through, it was a group process; it was several

7    people involved; it was several conversations,

8    several meetings.  I didn't get that.  Whether it

9    was a trainer or district manager, because of the

10   extensive hiring process, you don't fill out an

11   application and you get the job.  There was much,

12   much more involved.

13        Q.    Specifically, what support did you

14   not get that you feel you should have gotten or

15   would have gotten had you been a white district

16   manager in terms of hiring a trainer?

17        A.    The example that I gave to you

18   before with Julie Pieper, who was a former district

19   manager from California, how her director took over,

20   assumed half of her responsibilities so that she

21   could do things.  They shared; they worked

22   together.  It was a joint effort.  She was not --

23        Q.    Just so I understand, what you're

24   saying then is that Tracey not doing that --

1              MS. TIMM:  Okay.  You're doing it

2         again.  You're cutting her off.

3              MR. STACY:  Well, the answers just

4         go on and on and on, and it's beyond the

5         scope of the question.

6              MS. TIMM:  Well, before you said she

7         was being evasive, I think.  Now that she's

8         giving you very detailed --

9              MR. STACY:  Don't raise all that

10        again.  You know, we're getting along fine.

11        Let's keep it up.

12             MS. TIMM:  No.  I'm saying -- I'm

13        just recalling, before you were saying you

14        were not getting what you wanted.  Now that

15        she's giving you very detailed explanations,

16        that's not acceptable either.  I'm just

17        asking you to allow her to finish her

18        answer.

19   BY MR. STACY:

20        Q.      Go ahead.

21        A.      That was specifically it, the

22   example that I mentioned to you, yet again, with

23   Julie Pieper, how the support was given to her, how

24   toward the end when we finally were able to hire the

1    trainer, when we all worked together as a group and

2    I was able to hire the two trainers that I hired,

3    that was a group effort.    That's the way it should

4    have been done initially.    It never should have

5    lingered on as long as it did.    It should have been

6    a group effort from the very beginning.

7         Q.    What makes you think that that was

8    intentional sabotage by someone?

9         A.    Because we did not get a trainer.

10   We were not able to take the time and work together

11   as a group.    It was not a -- the company knows that

12   I needed a trainer; I need a trainer.

13        Q.    Couldn't there have been a reason

14   other than sabotage?

15        A.    What would that be?

16        Q.    You can't think of any other reason?

17        A.    They didn't want me there because of

18   my race, specifically.

19        Q.    That's the only reason for it that

20   you can think of?

21        A.    That is the only reason.

22        Q.    What makes you think that the

23   company not providing you more people to help with

24   the hiring process was racially motivated?

1      A.      It's not a one-person job.  The

2  company knows that.  It's not a process that they

3  do.  It's a group process in hiring.  It's not a

4  one-person job to try and hire trainers or any

5  employee for that company.  It's not a one-person

6  job.

7      Q.      How do you know that the same kind

8  of problems didn't happen to non-African-American

9  district managers?

10     A.      They all had trainers.

11     Q.      I'm talking about --

12     A.      I can only specifically talk about

13  my team.  I can't talk about anybody else's

14  experience.  I can only talk about my experience.

15  They all had trainers.  I had to go on the process

16  that was done when I was hired, and then when I

17  needed to hire, nobody was there.  I did not get the

18  full support that was needed.

19     Q.      Was there any occasion, while you

20  worked there, that there were open trainer positions

21  elsewhere on the team?

22     A.      To be perfectly honest, I don't

23  really recall if there was any opening.  If there

24  was an open position, they may have had one trainer,

92086ce0-73cb-11d7-b67d-444553540000