**SHARON GILB3ERT TIMM, ESQUIRE**
**Attorney I.D. 77778**
Penn's Court, Suite 111
350 South Main Street
Doylestown, PA  18901
(215) 489-0179

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KATRINA WILLIAMS-McCOY**     :        Plaintiff,                                     : | | CIVIL ACTION |
| v.                                                   : | | No. 02-CV-5125 |
| **STARZ ENCORE GROUP**           :        a/k/a **ENCORE MEDIA COMPANY**   :        Defendant.                                  : | | JURY TRIAL DEMANDED |

**PLAINTIFF'S MEMORANDUM OPPOSING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I.   FACTUAL AND PROCEDURAL STATEMENT

Plaintiff initially contacted Que Spalding, president of the company, for a position within Starz.  McCoy N/T p. 107:7-9.  Spalding referred her to Jillaina Wachendorf who in turn referred her to Robin Feller, McCoy N/T p. 107:7-23.  A letter was sent by Plaintiff to Ms. Feller after her conversations with Spalding and Ms. Wachendorf, McCoy N/T p. 307: 14-17.

Ms. McCoy was also interviewed by Miles McNamee during the interview process, McCoy N/T p. 51:20-24.  She was also interviewed by Robin Feller, Division Vice President, Feller, N/T 13:15-19.  Ms. McCoy had three interviews, Feller N/T 13:

1

21-23. At her third interview Susan Geiselhart, Division Vice President, was also present, Feller N/T 15:6-16.

The decision to hire McCoy was made by Sartino and Feller, Feller N/T 16:24, 17:1-2.

Katrina McCoy was the first person Tracey Sartino hired after Sartino was promoted to the position of Director, Sartino N/T 28 11-15; 30:2-6.

McCoy is also the only employee Sartino ever gave an action plan or corrective discipline, Sartino N/T 158:10-16. Katrina McCoy is also the only black management employee Sartino ever hired, Sartino N/T 221:23-24; 222:1-2. Sartino has been employed by Defendant since May of 1996 as a manager, Sartino N/T 6:1-8.

Feller participated in three corrective actions for Starz employees, one with McCoy (Plaintiff) a black female; one with another minority female who was also terminated in 1997; and the third individual was a white male who was not terminated in 1998 or 1999, Feller N/T 82:13-24; 83:1-21. Feller has been employed as a manager within Starz for fourteen to fifteen years, Feller N/T 88: 13-19. Feller never hired a black district manager prior to McCoy, Feller N/T 32:8-10, and Feller has never hired a black district manager after McCoy's period of employment, Feller N/T 32:11-13. Feller has interviewed and hired hundreds of people within Starz, Feller N/T 34:8-10.

Sartino gave the first corrective action discipline she's ever participated in to McCoy, Sartino N/T 152:1-24.

During Plaintiff's approximately eleven months of employment, the two trainer positions reporting to her were completely vacant for approximately six months, and she had only one trainer for a period of four months, she performed the responsibilities of

three different positions, McCoy N/T 246 :21-24; 247:1-5; Anderson N/T 76:15-17; Anderson N/T 78:1-24. Melissa Diehlman officially left Starz in June, 2000, after she did not return from her medical leave of absence, Anderson N/T 74:1-24; 77:12-24; 78:1-22. Anderson testified she thought Diehlman was hired in January, 2000, Anderson N/T 78:23-24; Diehlman actually started working for McCoy in March, 2000, see McCoy-14, Memorandum from McCoy to Sartino dated March 3, 2000, wherein McCoy is reporting regarding Diehlman's first three days of employment with Starz. Shortly after she began her employment with Starz, Diehlman took a leave for medical reasons, Anderson N/T 77:12-24.

Dienna reported to McCoy for only four months, McCoy N/T 61:21-24; 62:1-4.

II.  ARGUMENT

 A. <u>Summary Judgment Standard of Review</u>

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, reveal no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P 56(c). The Court's responsibility is not to resolve disputed issues of fact, but to determine whether there exists any factual issues to be tried. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-49, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).

An issue of material fact is "genuine" for purposes of summary judgment, if evidence is such that a reasonable jury could return a verdict for nonmoving party. <u>Troy Chemical Corp. v. Teamsters Union Local No. 408</u>, 37 F.3d 123 (3d. Cir. 1994). In making this determination, all of the facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the non-

moving party.  Anderson, at 256.  Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must establish the existence of each element of its case.  J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d. Cir. 1990) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).

Even when the facts are not in dispute, summary judgment should be denied if competing inferences can be drawn from the undisputed facts on material issues.  Hunt v. Cromartie, 526 U.S. 541 (1999)(where reasonable inferences from undisputed facts can be drawn in favor of either party, it is error for the district court to resolve the disputed fact of motivation at the summary judgment stage).

The basic rule is that "state of mind" issues typically should not be decided on summary judgment.  United States ex.rel.Cantekin v. University of Pittsburgh, 192 F.3d 402, 411 (3d Cir. 1999); *see also* Hutchison v. Proxmire, 443 U.S. 111 (1979)(such cases involving a person's state of mind such as motive, knowledge, intent, good faith or bad faith, malice, fraud, conspiracy, or consent seldom lend themselves to a summary disposition because questions of credibility will ordinarily abound); Gelb v. Board of Elections of New York, 224 F.3d 149 (2d Cir. 2000)(noting that summary judgment is generally inappropriate where case implicates questions of intent and state of mind); and Seamons v. Snow, 206 F.3d 1021, 1027-8 (10th Cir. 2000)(noting that grant of summary judgment is "especially questionable" in cases delving into party's state of mind).

    B.    <u>Plaintiff Can Prove Her Prima Facie Case</u>

Plaintiff is bringing a race discrimination case against her former employer claiming she was treated badly on the basis of her race.  Because Plaintiff does not have

4

direct evidence of Defendant's impermissible racial bias or motivation, Plaintiff must prove her case using the indirect model of proof.

Defendant argues that Plaintiff cannot establish her prima facie case because she cannot show she was qualified for her position nor was she discharged under circumstances giving rise to an inference of discrimination.

A Plaintiff must prove that he: (1) is a member of a protected class; (2) was qualified for his position; and (3) was discharged under circumstances that give rise to an inference of unlawful discrimination.  Hampton v. Borough of Tinton Falls Police Dep't. 98 F.3d 107 (3d Cir. 1996); Waldron v. S.L. Indus., Inc., 56 F.3d 491, 494 (3d Cir. 1995); Pirolli v. World Flavors, Inc., No. 98-CV-3596, 1999 WL 1065214, at *7 (E.D. Pa. Nov. 23, 1999).

It is common in discriminatory discharge cases for the last element of the prima facie case to be characterized as requiring that the plaintiff show that the position was filled by a person not of the protected class, see Sheridan v. E.I.DuPont deNemours & Co., 100 F.3d 1061, 1066 n.5 (3d Cir. 1996)(en banc) or that similarly situated non-protected persons were treated more favorably, see Josey v. John R. Hollingsworth Corp., 996 F.2d 632,, 638 (3d Cir. 1993).  Although a plaintiff may make out a prima facie case with such evidence, neither is required.  Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 1999 WL 689961 at *9-10, (3d Cir. 1999).

Here, it is undisputed that Katrina McCoy is a member of a protected class. Accordingly, we move to the next prong.

*McCoy Was Qualified for her Position*

5

In her Notice of Deposition pursuant to Fed.R.Civ.P. 30(b)(6), Plaintiff requested Defendant to produce a person or persons to testify on all reasons why Plaintiff was hired, Exhibit McCoy 11, ¶ 8. Defendant produced Sheryl Anderson and Robin Feller in response to the Notice of Deposition.

Feller testified the reason why McCoy was selected for the interview process for the district manager position was "her qualifications on her resume fit what we were looking for in the position", Feller N/T 12:21-24. Specifically, McCoy's ad sales marketing experience was the qualification desired, Feller N/T 13:1-7.

Sartino testified that she would not have hired McCoy if McCoy didn't meet the job requirements, and McCoy was "what we needed for the position", Sartino N/T 157:3-10.

Viewing this evidence in the light most favorable to Plaintiff and drawing all reasonable inferences therein, a reasonable juror could find that Plaintiff was qualified for her position.

*Circumstances of Her Discharge*

In Plaintiff's Request for Production of Documents, Plaintiff requested any and all documents relating to similarly situated white District Managers who received corrective discipline memorandums, Request No. 11; any and all documents relating to similarly situated white District Managers who received 90-day action plans, Request No. 12; and any and all documents who were hired and terminated in less than one year, Request No. 13, Exhibit J. In response to Plaintiff's requests, Defendant produced the personnel file of Michael Doherty, a white male district manager who was hired in August, 2000, and terminated in July, 2001, see Exhibit I, Exit Interview of Michael Doherty. According to

6

Defendant's documents, Mr. Doherty was separated from employment with Starz on July 6, 2001, because he **chose** to terminate his employment due to "creative differences" between himself and upper management, Id.  Although Mr. Doherty also received a corrective action memorandum dated May 25, 2001, he is NOT similarly situated to Plaintiff as Defendant claims due to the fact Doherty was not terminated by Defendant, see Exhibit I, Corrective Action Memo, bate-stamped SEG/MC1148.

      To be deemed 'similarly situated' the individuals with whom a plaintiff seeks to be compared must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.  Dill v. Runyon, 1997 U.S. Dist. LEXIS 4355, 1997 WL 164275, at *4 (E.D.Pa. April 3, 1997)(citing Anderson v. Haverford College, 868 F.Supp. 741, 745 (E.D.Pa. 1994); Watkins v. The Children's Hosp. of Philadelphia, 1997 U.S. Dist. LEXIS 19268, 1997 WL 793518, at *2 (E.D.Pa. Dec. 3, 1997).

      Katrina McCoy raised issues of discrimination in November, 2000, shortly after her termination in her letter to Sheryl Anderson of Human Resources, see Exhibit H, letter dated November 21, 2000, from McCoy to Anderson, bate-stamped SEG/MC1131.  Mr. Doherty's corrective action memorandum was done AFTER Plaintiff made her claims of disparate treatment—further Doherty reported to another division of Starz.  He did not work in the Sartino/Feller organization, did NOT receive a 30 60 90 action plan, was given a corrective action memorandum fully seven months AFTER Plaintiff was terminated, and most importantly, apparently CHOSE to terminate himself.  Mr. Doherty was not involuntarily separated from his employment with Starz as was Plaintiff.

Given that Defendant could only produce documents relating to Doherty who is not similarly situated to Plaintiff in response to Plaintiff's request to Defendant for all documents of similarly situated employees, it is quite evident there are no similarly situated white employees to Plaintiff.

Sartino gave the first corrective action discipline she's ever participated in to McCoy, Sartino N/T 152:1-24. McCoy is also the only employee Sartino ever gave an action plan or corrective discipline, Sartino N/T 158:10-16. Katrina McCoy is also the only black management employee Sartino ever hired, Sartino N/T 221:23-24; 222:1-2. Sartino has been employed by Defendant since May of 1996 as a manager, Sartino N/T 6:1-8.

Feller testified she participated in three corrective actions, one with McCoy a black female; one with another minority female who was also terminated in 1997; and the third individual was a white male who was not terminated in 1998 or 1999, Feller N/T 82:13-24; 83:1-21. Feller has been employed as a manager within Starz for fourteen to fifteen years, Feller N/T 88: 13-19. Feller testified she never hired a black district manager prior to McCoy, Feller N/T 32:8-10, and Feller has never hired a black district manager after McCoy's period of employment, Feller N/T 32:11-13. Feller has interviewed and hired hundreds of people within Starz, Feller N/T 34:8-10.

Given the fact that there are no similarly situated white district managers to Plaintiff, that Plaintiff was the first black management individual ever hired by Sartino (and apparently the last), that Plaintiff was also the first employee Sartino ever gave a corrective discipline or action plan to, McCoy was only employed by Starz for eleven months, Feller had only terminated one other district manager after participating in a

8

corrective action—a district manager who was also a minority female, that McCoy was handling the job responsibilities for three positions for more than half of her employment, and support individuals who were assisting Plaintiff were suddenly removed, see Exhibit H, email dated October 4, 2000, bate-stamped SEG/MC0772-0760, wherein Ena was no longer assisting Plaintiff nor was the admin in Philly (Lisa Benjamin).  Plaintiff testified when she would try to give Ena an assignment, Sartino would stop it in midstream, McCoy N/T 149:2-6.

In fact, Plaintiff had asked early in her employment of Miles McNamee, Vice President, in the Philly office where she worked the best way to utilize his office support, Exhibit H, email dated March 10, 2000, bate-stamped SEG/MC0883.  McCoy was reprimanded numerous times for attempting to utilize corporate and administrative support, McCoy N/T 218:4-8.

McCoy did go to Feller to complain about Sartino's treatment, McCoy N/T 147: 12-16.  McCoy told Feller she was being treated differently, McCoy N/T 147:20-24.

*Plaintiff was Replaced by a White Female, a Person Outside the Protected Class*

Additionally,  Plaintiff can also show she was discharged under circumstances giving rise to an inference of discrimination in that McCoy's position was filled by Mary O'Connor, a white female, who had held the position prior to McCoy, Sartino N/T 143:5-12.  In fact, Mary O'Connor still holds McCoy's position today, Sartino N/T 143:10-12.

Viewing all the evidence in the light most favorable to McCoy and drawing all reasonable inferences therefrom, a reasonable juror could find that the circumstances surrounding Plaintiff's discharge give rise to in an inference of impermissible race-based decisionmaking.

C.   Plaintiff Can Show Pretext

It is Plaintiff's contention that Defendant's stated reason is pretextual in nature due to its weaknesses, inconsistencies, and contradictions in the employer's proffered legitimate reasons. Further, Defendant's state of mind and motives for their actions are at issue here; therefore, because issues of credibility are present, this case must go forward to a jury for resolution.

Defendant argues that Plaintiff was discharged for deficient performance, defense brief p. 7.

A Plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (1) discrediting the proffered reasons, either circumstantially or directly, or (2) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

In order to survive a motion for summary judgment in a pretext case, the plaintiff must produce sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action. This is ordinarily done by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could reasonably find them 'unworthy of credence.'" Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 5301 (3d Cir. 1993)).

In Sattar v. Motorola, Inc., 138 F.3d 1164, 1170 (7th Cir. 1998) the court held that the employer's use of subjective criteria may leave it more vulnerable to a finding of

discrimination, when a plaintiff can point to some objective evidence indicating that the subjective evaluation is a mask for discrimination.

In <u>Medina v. Ramsey Steel</u>, 238 F.3d 674 (5th Cir. 2001), the court held where the employer's proffered reasons involve subjective evaluations, plaintiff's claim cannot be defeated on summary judgment since credibility of employer's assessment is at issue.

The factfinder may infer from the combination of the Plaintiff's prima facie case and its own rejection of the employer's proffered nondiscriminatory reasons that the employer unlawfully discriminated against the Plaintiff and was merely trying to conceal its illegal act with its articulated reason, <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993).

Here, the employer's proffered reasons involve subjective evaluations such as Plaintiff needed to understand the budget, Plaintiff needed to increase her knowledge of territory, Plaintiff had to increase her sales and product knowledge, and Plaintiff needed to improve her organizational skills as well as some objective goals, Exhibit No. 4, Memo dated July 26, 2000. Plaintiff testified she thought her product knowledge was thorough prior to June, 2000, and she was unaware Sartino thought differently due to the fact she (McCoy) was already conducting the majority of product knowledge trainings on her own, McCoy N/T 247:7-24. As for the mandate to develop and implement marketing plans for Boston and Pittsburgh, Plaintiff testified she had already completed those plans, McCoy N/T 248:14-22. Plaintiff also testified she completed the third bullet item on the action plan, McCoy 252:12-22.

11

Regarding understanding of the budget, McCoy stated she understood it as well as anyone else, yet she was the only one to receive a written memo about it, McCoy N/T 253:8-16.

One of the objective goals was to hire employees for the vacant trainer positions by September 2000. Plaintiff testified regarding Todd Goldman that during Goldman's interview for a trainer position with McCoy, Goldman was asked by Feller to take a look at McCoy and ask himself whether he could work for someone like her, McCoy N/T 105:5-17. McCoy had been promised by Sartino and Feller that Goldman would be hired as her trainer, McCoy N/T 98:1-4; 97:24; 98:15-18. A little more than a week after Goldman's interview, McCoy received a call from him asking if McCoy had heard anything, McCoy N/T 100:14-19. When McCoy called Feller, Feller stated, "oh, Tracey did not tell you? We decided that he's not a fit. We decided we're not going to hire him", McCoy N/T 100:19-23. Plaintiff believes this decision by her management team to not hire Goldman was racially motivated inasmuch as she was drowning in work, and doing more work than her white counterparts, McCoy N/T 104:1-7.

In Plaintiff's Interrogatories Propounded to Defendant, Exhibit J, in ¶ 7 Defendant was questioned why there was a shortage of trainers. In addition to placing blame upon Plaintiff, Defendant responded, "the market for trainers during the year 2000 was tight". Plaintiff could not unilaterally hire someone for the trainer position; she needed to consult with Sartino and Feller, Feller N/T 55:18-24; 56:1-5. Feller recalls that in the July meeting with McCoy to discuss the action plan, she told McCoy that both she and Sartino would assist McCoy in filling the vacant trainer positions and also enlist the aid

12

of Human Resources to post the positions (advertise in newspapers), Feller N/T 87:20-24; 88:1-12.

However, it is Plaintiff's testimony it was she who asked assistance of Sartino and Feller to hire trainers, McCoy N/T 257:9-18. McCoy also asked if HR could become more involved in the hiring of the trainers, McCoy N/T 159: 1-15. See also email dated October 13, 2000, Exhibit H, bate-stamped SEG/MC0726, wherein McCoy advised Sartino and Feller that a trainer candidate withdrew from the interview process. Some resumes forwarded from HR for the trainer positions were stale by the time McCoy received them, McCoy N/T 167:19-24; 168:1-7.

Regarding Defendant's argument that Plaintiff herself was "ambivalent" because she testified she "had not been discriminated against", Plaintiff offers that this comment is capable of two meanings and Plaintiff's affidavit, attached hereto as Exhibit K, conclusively establishes that in fact, Plaintiff meant she had not been discriminated against by anyone prior to her employment with Starz.

Plaintiff disagreed with the Corrective Discipline Memorandum dated September 28, 2000, (Exhibit A, McCoy-5). Specifically, McCoy testified that under the category of Performance or Behavioral Problem(s), the first two items were untrue, and the third item (the Boston marketing support letter) was an incomplete item from Mary O'Connor, McCoy N/T 255:6-24; 256:1-7.

In an email communication dated January, 12, 2000, O'Connor informed Anne Dienna and Sartino that the client (Jeff Levy) had never signed his year 2000 coop agreement that was sent to him the beginning of December, 1999, Exhibit H, bate-stamped SEG/MC1027-1028. O'Connor also sent a letter dated January 4, 2000, to her

13

MediaOne accounts informing them that Dienna and Sartino were taking over the accounts from her, despite the fact McCoy was now handling them, Exhibit H, bate-stamped SEG/MC1042.

O'Connor testified she transitioned her accounts to Sartino on December 9, 1999, O'Connor N/T 57:1-10. Sartino alone had that responsibility as of December 9 through December 30, 1999, and failed to follow up. Almost one month later, O'Connor is still sending information to clients about Sartino and Dienna handling the account, but inexplicably fails to mention McCoy is now handling the accounts. Now in September, 2000, Sartino is disciplining McCoy for Sartino's own failure to follow up with the client. See also Exhibit D, McCoy-22 wherein McCoy informs Sartino Levy has questions he needs answers to from Sartino before signing the marketing support letter.

Again as with the July, 2000, action plan, Defendant uses subjective criteria to measure Plaintiff's performance in the September, 2000, corrective discipline. For example, Defendant wants Plaintiff to "increase knowledge of territory", "be more prepared for client meetings", and "improve organizational skills"—all which are subjectively measured. Objectively, everyone can agree that for the largest part of her employment, McCoy was performing the work of three positions—hers, and her two trainers. Plaintiff testified it was humanly impossible for her to complete all the items listed in the Action Plan as she was performing the work of three individuals, McCoy N/T 246:21-24; 247:1-5. To quote Plaintiff, she was not Superwoman, McCoy N/T 251:12-13.

As early as January, 2000, Plaintiff believes Defendant showed its racial animus when Plaintiff was scheduled to go to Boston with Sartino to meet the client, and Sartino

failed to show up, McCoy N/T 114:9-12. McCoy did not have a rental car and was expected to take the client to lunch, McCoy N/T 115:4-12. Sartino failed to even call McCoy, McCoy N/T 114:22-24. McCoy called Sartino who never provided a reason for her failure to show, McCoy N/T 116:6-11. Sartino did not provide an apology to McCoy nor an explanation, McCoy N/T 117:7-13. Rather than cancel the meeting, Sartino left McCoy to handle it herself. See email dated January 18, 2000, Exhibit H, bate-stamped SEG/MC1000, wherein McCoy questioned Sartino about whether she should prepare an agenda for the Levy meeting. Boston is a key account for Starz, McCoy N/T 121:22-24. McCoy had no information with her; Sartino had it, McCoy N/T 122:10-12.

McCoy testified that at one of her first regional meetings she attended, Feller walked up to her and stated in a very hostile way with others present, "you cannot do this job", McCoy N/T 152:20-24; 153:1-24. Another time at a meeting in Boston with Feller present, Levy (the client) made a nice comment to Feller about Sartino, and Feller stated to McCoy, "see, he didn't say anything about you; he said something about Tracey", McCoy N/T 231:4-16.

Susan Lewis was a Director in the Philadelphia office for the Comcast team who was promoted to the position of Division Vice President and then left pursuant to a written agreement in February, 2002, Lewis N/T 11:7-15; 16:12. Lewis was hired in October, 1999, by Starz, Lewis N/T 11:5. Lewis is black. Lewis told McCoy Wachendorf didn't want Lewis to talk to McCoy, Lewis N/T 139:14-24.

Explanations regarding Plaintiff's responsibilities from Sartino were partial, not full and complete, McCoy N/T 130:8-15. When McCoy asked Sartino to explain the profitability analysis, Sartino did not, McCoy N/T 130:14-20. McCoy went to Joe

15

Zamora, a research person, for assistance, McCoy N/T 130 17-20. McCoy also went to Miles McNamee, the Vice President on the other team who worked in the Philadelphia office, who referred her to Zamora, McCoy N/T 131 23-24; 132:1-9. McCoy was not aware of corporate resources available to her until after her new employee orientation four months after her hire, McCoy N/T 132:3-10. In order to learn her job, McCoy made a concerted effort to gain written materials; no one gave her written materials for her position, McCoy N/T 137:1-24; 138:17-20.

The first time McCoy learned Sartino thought McCoy was not doing her job was at her deposition, McCoy N/T 171:1-11. However, during account review meetings, Sartino and Feller mistreated and criticized McCoy as well as put her down, McCoy N/T 180:5-15. Sartino also deliberately withheld information from McCoy, McCoy N/T 203:16-24; 204:1-4, 8-13. On another occasion, McCoy prepared overheads for a product presentation which were completed by Kinko's, McCoy N/T 206 4-12. Sartino asked McCoy to send the overheads to Willcom, McCoy N/T 206:8-12. Despite McCoy requesting their return, the overheads were never returned, McCoy N/T 206:20-24. McCoy had to spend another evening in Kinko's to prepare them for her upcoming presentation, McCoy N/T 208:4-20.

Viewing all the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences therefrom, a reasonable juror could decide that Defendant's subjective evaluations of Plaintiff's performance coupled with Plaintiff's lack of trainers to perform her work responsibilities, numerous incidents where Plaintiff was denied the tools and marketing and administrative support necessary to complete her job responsibilities as well as the fact there are no similarly situated district managers who

received both an 90 day action plan as well as a corrective discipline and who were terminated in the same amount of time as she, were so weak, implausible and inconsistent and that Defendant was impermissibly race-motivated in its decisionmaking. Therefore, this case must go forward to a jury for resolution.

III.   CONCLUSION

Therefore, for all the foregoing reasons and authority of law, Defendant's Motion for Summary Judgment must be denied.

                                            Respectfully submitted,


Date: _____        _____
                                            Sharon Gilbert Timm, Esquire
                                            Attorney for Plaintiff