# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATRINA WILLIAMS-McCOY,       :
               Plaintiff,        :
                               :
       v.                    :        CIVIL ACTION
                               :
STARZ  ENCORE GROUP          :        NO. 02-5125
a/k/a ENCORE MEDIA COMPANY,     :
               Defendant.      :

## Memorandum and Order

YOHN, J.                                   February _____, 2004

Plaintiff Katrina Williams McCoy ("McCoy") brings this Title VII action against her former employer, Starz Encore Group ("Starz"), alleging that defendant's decision to terminate her employment was impermissibly motivated by race-based animus.  Presently before this court is defendant's motion for summary judgment.

### I.   Factual Background[1]

In the autumn of 1999, plaintiff Katrina Williams McCoy applied for a position as District Manager of the East Coast region at Starz, a national media company.  Pl.'s Answer to

---

[1] The account contained in this section is comprised of both undisputed facts and plaintiff's factual allegations. *See Skoczylas v. Atlantic Credit & Fin., Inc.,* 2002 WL 55298, at *2 (E.D.Pa. Jan. 15, 2002) ("When considering a motion for summary judgment, a court must view all facts and inferences in a light most favorable to the nonmoving party.") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)); *see also Brown v. Muhlenburg Township,* 269 F.3d 205, 208 (3d Cir.2001) (citing *Beers- Capitol v. Whetzel,* 256 F.3d 120, 130 n. 6 (3d Cir.2001)).

1

Def.'s Statement of Uncontested Facts ("Pl.'s Statement"); *see also* McCoy Dep. at 9 and 107.

After speaking with Que Spalding, the president of Starz, and Jillaina Wachendorf, plaintiff was

referred to Robin Feller, the regional vice president of Starz.  McCoy Dep. at 107.  On October

21, 1999, plaintiff sent a letter to Feller indicating that she had experience in the cable industry

and was interested in a District Manager position at Starz.  *Id.* at 306-08.  Plaintiff was

interviewed by Starz Director Tracey Sartino, Feller, Miles McNamee, a regional vice president,

and Susan Geiselhart, division vice president.  Pl.'s Statement at ¶¶2-3.  Upon defendant's

decision to hire McCoy, Feller called plaintiff, offered her the position at a starting annual salary

of $60,000, and plaintiff commenced work as District Manager for the East Coast region of Starz

on December 30, 1999.  *Id.* at ¶¶ 4-8.  Plaintiff's salary of $60,000 was $5,000 to $10,000 more

than the salary offered to Colleen Willcom, a Caucasian female who began employment with

Starz as a District Manager shortly after plaintiff.  *Id.* at ¶ 7.

   Although Sartino has hired other African-Americans during her time at Starz, plaintiff

was the first African-American hired by Sartino for a management position.  Sartino Dep. at 221-

22.  Feller has personally participated in hiring at least two other African-Americans, both male,

for the positions of trainer and District Manager.  Feller Dep. at 33-35.

   As District Manager, plaintiff was part of the AT&T system.  McCoy Dep. at 17.  This

system had two directors, each responsible for one portion of the country, and several district

managers working for each director.  *Id.*  McCoy reported to Tracey Sartino, her director, who in

turn reported to Robin Feller, a regional vice president.  *Id.* at 17-18.  As a district manager,

plaintiff was responsible for product knowledge training within the AT&T cable system, for

implementation of both national and regional movie-based incentives, for developing the

marketing tactics used to grow Starz's subscriber base, and for creating effective telemarketing systems. *Id.* at 9-15.

During plaintiff's employment at Starz, she experienced general unfriendliness in the workplace, several incidents of perceived hostility, and a lack of training and support from her supervisors.[2]

On July 27, 2000, Sartino met with plaintiff to discuss an "Action Plan" that she had prepared one day earlier. Pl's Statement at ¶ 10. The 90-day Action Plan, prepared by Sartino due to her perception that McCoy was not performing at the expected level,[3] set forth several performance objectives for plaintiff, outlined Sartino's expectations, and established 30, 60, and 90-day deadlines for the completion of each task. *See* Def.'s Mot. Summ. J at Ex. D ("Action Plan"). The six objectives set forth for McCoy by the Action Plan included the following: increase knowledge of territory; develop and implement marketing plans for Boston and Pittsburgh; increase sales and product knowledge; understand the budget; hire two trainers in the

---

[2]These incidents are discussed in greater detail below. Because the specifics of each incident are relevant to plaintiff's discrimination claims, and therefore require discussion during this court's analysis, I will not recount these details preliminarily as well.

[3]In her deposition, Sartino explained that she prepared the action plan because plaintiff "was not performing at a level that was expected." Sartino Dep. at 120. While plaintiff disputes that her performance was deficient, alleging instead that Sartino's criticisms were racially motivated, this court relies upon Sartino's testimony as background information only. The court's role is not to resolve disputed issues of material fact, and I am mindful that all facts must be viewed in the light most favorable to the plaintiff. In this instance, however, it is useful to rely upon Sartino's testimony to establish the sequence of events leading up to the issuance of McCoy's Action Plan, the substance of which is crucial to the case at bar.

Philadelphia office by September 2000; improve organizational skills. *Id.*[4] Plaintiff met some of the objectives before the deadlines, and failed to meet others. Pl.'s Statement at ¶ 11.

On September 28, 2000, plaintiff received a Corrective Discipline Memorandum which detailed several "performance or behavioral problems," defendant's expectations, proposed solutions, and consequences should plaintiff's performance or behavior not improve to the expected level. *See* Def.'s Mot. Summ. J at Ex. E ("CDM").[5]

Following the expiration of the 90-day portion of plaintiff's Action Plan, Sartino and Feller met to discuss plaintiff's job performance, determined that she should be terminated, and terminated plaintiff on November 15, 2000. Def.'s Statement of Uncontested Facts in Support of Mot. Summ. J. at ¶ 13-17; Pl.'s Statement at ¶ 13-17. Prior to plaintiff's termination, Feller had participated in two corrective discipline actions, one with a minority female who was ultimately terminated and one with a Caucasian male who was not terminated. Feller Dep. at 82-84. Sartino had never taken part in a corrective action prior to issuing the CDM to plaintiff, nor had she been involved in terminating an employee. Sartino Dep. at 158.

On August 30, 2001, McCoy contacted the Equal Employment Opportunity Commission, alleging that Starz had discriminated against her by terminating her employment. McCoy Dep. at 200; *see also* Ltr. from McCoy to Daniel McGuire, Aug. 30, 2001 (attached to McCoy Dep. as Ex. 1). The EEOC then issued a "right to sue" notice to plaintiff on April 25, 2002. *See* Compl.

---

[4]Many of the objectives were elaborated upon by bullet points detailing Sartino's expectations. *See* Action Plan.

[5]While plaintiff does not dispute the content of the CDM, nor the fact that she received it, she disputes the validity of the CDM's substance and contends instead that this document is "pretextual in nature." Pl.'s Statement at ¶ 12.

4

Ex. A.  Plaintiff then filed this action, and presently before the court is defendant's motion for

summary judgment.

## II.  Legal Standards

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c).  This court may not resolve disputed factual issues, but rather should determine

whether there are genuine, material factual issues that require a trial.  *See Anderson v. Liberty*

*Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).  Where "the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party," however, there is "no genuine issue for

trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

(quotations omitted).  In order to determine whether summary judgment is appropriate in this

particular case, all of the facts delineated above are stated in the light most favorable to the

plaintiff as the non-moving party.  *See Saldana v. Kmart Corp.,* 260 F.3d 228, 232 (3d Cir.

2001).  While this court will draw all reasonable inferences in plaintiff's favor, however, plaintiff

must do more than rest upon mere allegations, general denials, or vague statements.  *Trap Rock*

*Indus., Inc. v. Local 825*, 982 F.2d 884, 890 (3d Cir. 1992).  Rather, plaintiff "must present

affirmative evidence" in order to defeat a motion for summary judgment."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 257 (1986).[6]

---

[6]Plaintiff correctly points out that summary judgment may be inappropriate where
competing inferences can be drawn from the undisputed facts or when a case implicates
questions of "state of mind" or "intent."  *See* Pl.'s Mem. Opposing Def.'s Mot. Summ. J. at 4.
Resolution of summary judgment in this case, however, does not require the court to resolve

Title VII prohibits an employer from discrimination against any individual on the basis of "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  To prevail on a Title VII claim, McCoy must present circumstantial evidence of discrimination using the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[7]  Pursuant to *McDonnell Douglas*, a plaintiff must first provide evidence to support a prima facie case of discrimination by a preponderance of the evidence.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).  If plaintiff succeeds in establishing a prima facie case, defendant then must "articulate some legitimate, nondiscriminatory reason for the employee's [termination]."  *McDonnell Douglas*, 411 U.S. at 802.  If defendant does so, the burden shifts back to plaintiff to show that the reasons proffered by defendant were not its true reasons, but rather a pretext for discrimination.  *Id.* at 804.

### III.   Analysis

A.     **McCoy's Prima Facie Case**

The existence of a *prima facie* case of race-based employment discrimination "is a question of law that must be decided by the Court."  *Sarullo v. United States Postal Service*, 352

---

disputed issues of material fact.  The court has carefully and thoroughly considered the evidence in this case, and any discrepancy between the parties' factual accounts has been resolved in plaintiff's favor.  Furthermore, the mere fact that employment discrimination claims necessarily implicate an employer's motivation– or "intent"– does not shield such actions from summary judgment.  Title VII race-based discrimination claims are oftentimes resolved at the summary judgment stage, and– given the completeness of the record in this case– I see no difficulty in resolving this case summarily as well.

[7]Plaintiff concedes that she has no direct evidence of discrimination.  *See* Pl.'s Mem. Opposing Def.'s Mot. for Summ. J. at 4-5.  Where no such direct evidence exists, courts use the burden-shifting scheme set forth in *McDonnell Douglas* to assess a plaintiff's circumstantial evidence of discrimination.

F.3d 789, 797 (3d Cir. 2003).   In order to make out a *prima facie* case of racial discrimination,

McCoy must satisfy a four-prong test: she must establish that (1) she is a member of a protected

class, (2) that she was qualified for her position, (3) that she was subjected to an adverse

employment action despite being qualified, and (4) that Starz continued to seek out individuals

with qualifications similar to hers to fill the position "under circumstances that raise an inference

of discriminatory action."  *Id.*; *see also Hampton v. Borough of Tinton Falls Police Dept.*, 98

F.3d 107, 112 (3d Cir. 1996) (describing the fourth prong as requiring that plaintiff establish that

her termination occurred under circumstances giving rise "to an inference of unlawful

discrimination") (quoting *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253

(1981)); *see also Geraci v. Moody-Tottrup, Intern., Inc.*, 82 F.3d 578, 580-81 (3d Cir. 1996)

(quoting same); *Waldron v. SL Indus.*, 56 F.3d 491, 494 (3d Cir. 1995) (quoting same).[8]  The

elements of a *prima facie* case must be established by a preponderance of the evidence.  *See St.*

*Mary's*, 509 U.S. at 506.

The parties do not dispute that plaintiff is a member of a protected class, nor do they

dispute that she was terminated from her position at Starz.  Whether or not McCoy has made out

a prima facie case, therefore, turns upon the second and fourth prongs of the prima facie test:

whether she was qualified for the position, and whether the circumstances surrounding her

_____

[8]The purpose of the *prima facie* case is to "eliminate the most obvious, lawful reasons for
the defendant's action (i.e., the position that an applicant sought was not filled for economic
reasons, the applicant was not qualified, no adverse action such as failure to hire or firing was
actually taken, etc.)."  *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999) (citing
*Burdine*, 450 U.S. at 253-54 ("The prima facie case serves an important function in the litigation:
it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection.")).

termination give rise to an inference of discrimination.[9]

(1) Job Qualification

McCoy must establish that she was qualified for her position.  After almost seven months

on the job, plaintiff was given a "90-Day Action Plan" by Tracey Sartino, a Starz Director and

plaintiff's direct supervisor.  *See* Action Plan; *see also* Def.'s Statement of Uncontested Facts in

Supp. of Mot. Summ. J. at ¶ 10 (attached to Def.'s Mot. Summ. J. as Ex. A); Pl.'s Answer to

Def.'s Statement of Uncontested Facts at ¶ 10.[10]  The Action Plan set forth six improvement

objectives for plaintiff, as well as deadlines by which she was expected to have completed them.

*See* Action Plan at 1-2.  Plaintiff admits that she did not meet each and every goal set forth in the

Action Plan.  *See* Def.'s Statement of Uncontested Facts in Supp. of Mot. Summ. J. at ¶ 11

(attached to Def.'s Mot. Summ. J. as Ex. A); Pl.'s Answer to Def.'s Statement of Uncontested

Facts at ¶ 11.[11]

---

[9]This court is mindful of the fact that "the elements of a *prima facie* case depend on the facts of the particular case" and cannot be established on a "one-size-fits-all basis." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999) (citing *Pivirotto v. Innovative Sys. Inc.,* 191 F.3d 344, 352 (3d Cir. 1999); *Torre v. Casio, Inc.,* 42 F.3d 825, 830 (3d Cir. 1994)).  The ensuing analysis, therefore, takes into account the unique factual scenarios and analytical problems associated with race-based employment discrimination actions.

[10]While plaintiff disputes the date of the Action Plan, she admits that she received this document.  Plaintiff contends that the Action Plan was "given to and discussed with [her] on July 27, 2000, at 11:00 A.M.," while defendant states that plaintiff was given the Action Plan on July 26, 2000.  It appears from the record that the Action Plan was prepared on July 26, 2000, and discussed with plaintiff the next day, July 27, 2000.  This distinction is immaterial, and does not give rise to a significant factual dispute.  I will assume for the purposes of this opinion that the Action Plan was delivered to plaintiff on July 27, 2000.

[11]More specifically, plaintiff testified that she had difficulty understanding the Starz budget as required by paragraph 4 of her Action Plan.  *See* Action Plan; *see also* McCoy Dep. p. 252-53 (attached to Pl.'s Answer to Def.'s Mot. Summ. J. as Ex. A).  She also admits that she did not hire two trainers in the Philadelphia office, as required by paragraph 5 of the Action Plan.  *Id.*

Two months later, plaintiff was given a Corrective Discipline Memorandum setting forth plaintiff's performance and behavioral problems, as perceived by Sartino, Starz's expectations and proposed solutions to plaintiff's problems, and consequences should plaintiff's behavior and performance not improve to the expected level. *See* CDM. While plaintiff disputes the truth of certain portions of the CDM, she admits that she had difficulty understanding "SEG products and sales strategies," the "Effective License Fee model," and "Profitability Analysis," as stated in the CDM's fourth bullet point. *Id.*; *see also* McCoy Dep. at 256.

Following the expiration of the 90-day Action Plan, plaintiff's supervisors met to discuss her job performance. *See* Def.'s Statement of Uncontested Facts in Supp. of Mot. Summ. J. at ¶ 13 (attached to Def.'s Mot. Summ. J. as Ex. A); Pl.'s Answer to Def.'s Statement of Uncontested Facts at ¶ 13. In light of her failure to satisfy fully the expectations set forth in the Action Plan and CDM, director Tracey Sartino and Vice President Robin Feller decided to terminate plaintiff because "she was not meeting the job requirements that were needed for the position." Sartino Dep. p. 156, ll.22-23.

When evaluating whether a plaintiff is "qualified" for the purposes of a *prima facie* case, courts must rely upon "objective" factors. *See Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995) (citing *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990)). Subjective qualities, conversely, such as "leadership or management skill," are "better left to the later stage of the *McDonnell Douglas* analysis." *Weldon*, 896 F.2d at 798.

In *Weldon*, the Third Circuit considered whether a plaintiff alleging employment

---

Plaintiff did, however, according to her testimony, accomplish several of the objectives identified in the Action Plan. *See* Action Plan; *see also* McCoy Dep. p. 253-54.

discrimination against his former employer had been "qualified for his position," as required to

establish a *prima facie* case. *Id.* The plaintiff in *Weldon* had received negative performance

evaluations; however, these evaluations relied mainly upon subjective criteria and thus did not

necessarily establish that plaintiff was unqualified:

> [His supervisor] found that [plaintiff] lacked 'a sense of priorities,' the 'desire to increase
> knowledge of company policies and procedures,' and that he failed to put forth a
> 'concerted effort' to broaden his skills. [Another supervisor] indicated that [plaintiff] had
> difficulty understanding and preparing the reports that were required of him, that he
> lacked initiative, and that he avoided active involvement in the day-to-day operations of
> the department. On the other hand, [the supervisor's] evaluation that [plaintiff] failed to
> meet performance goals in the areas of productivity, output, and efficiency is based on
> objective criteria. In this instance, however, it is unclear whether the goals constituted a
> standard of performance expected of all assistant supervisors or instead represented a
> subjective determination by [the supervisor] of the performance level [plaintiff] had to
> achieve to be deemed a satisfactory assistant supervisor in that department. . . . We
> certainly do not question [defendant's] prerogative to set any standards it wishes for
> employee performance nor do we seek to substitute our view of what constitutes adequate
> performance. We simply decline to treat these subjective assessments as evidence that
> [plaintiff] has failed to establish a *prima facie* case, thereby collapsing the entire analysis
> into a single initial step at which all issues are resolved. Rather, we will consider the
> assessments in the context of [plaintiff's] charge that the poor evaluations he received
> were a pretext for racial discrimination and unworthy of credence.

*Id.* at 799 (citations omitted).

In this case, plaintiff's negative performance evaluations rely upon both objective and

subject factors, thus complicating this court's ability to determine whether or not plaintiff was

"qualified" for her position. The sole evidence that plaintiff offers in support of her contention

that she was in fact "qualified," however, is the unhelpful contention that the fact that McCoy

was hired in the first place establishes that she was a qualified candidate. *See* Pl.'s Memo.

Opposing Def.'s Mot. Summ. J. at 6. Defendant obviously believed that plaintiff had the

requisite qualifications when she was hired, otherwise it would not have hired her. Were this the

standard used to determine an employee's qualifications, however, no employee could *ever*

become unqualified, because any employee– no matter how deficient her performance– could

argue that because she was hired, she must be qualified.  This argument is not persuasive.

Plaintiff would be better served to have put forth evidence of her high-quality performance on the

job, individual successes, testimony from co-workers as to her qualifications, etc.  She provides

nothing of the sort, however, offering instead three short sentences explaining that she was

initially hired because Tracey Sartino and Robin Feller believed she met the job requirements.

*Id.*

       Nonetheless, I am mindful of the Third Circuit's emphasis that negative performance

evaluations are often subjective and, therefore, will not always serve to establish that a plaintiff is

unqualified.  *See, e.g., Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 330 (3d Cir.

1995) (finding a former employee to have been "qualified," based on objective factors, where he

had twenty-three years of experience and an overall rating of "competent"); *Sempier*, 45 F.3d at

729 (relying upon objective factors only– plaintiff's twenty years of experience and the official

positions held during that time– to conclude that plaintiff was "qualified").  Despite the fact that

plaintiff has made no showing of her qualification, I will assume– for the purposes of her *prima*

*facie* case– that she was qualified for the job because some of her negative performance

evaluations were based on subjective factors.  *But see Volk v. Pribonic*, No. 94-2165, 1994 WL

230103 (W.D. Pa. Jan. 16, 1994) (finding that an employment discrimination plaintiff was not

qualified where his brief did not address his qualification and he failed to present any evidence to

establish that he was qualified for his position).

<u>(2) An Inference of Discrimination</u>

       Under the fourth prong, in order to present a *prima facie* case plaintiff must establish that

11

defendant's actions– while filling the position left vacant by McCoy's termination– raise an inference of discrimination.

"Common circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside of the relevant class." *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999). "Although a plaintiff may make out a prima facie case with such evidence,...neither of these is *required*." *Id.* (emphasis in original) (citing *Pivirotto*, 191 F.3d at 356-57). Indeed, in *Pivirotto* the Third Circuit made clear that the showing required to satisfy the fourth element of a plaintiff's *prima facie* case will vary depending upon the circumstances. *Pivirotto*, 191 F.3d at 357 ("we have repeatedly emphasized that the requirements of the prima facie case are flexible, and in particular that 'the fourth element must be relaxed in certain circumstances'") (quoting *Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir. 1994)). Illustrating this point, the Pivirotto court noted that the fourth prong of a plaintiff's prima facie case could be satisfied in many different ways: a discharged age-discrimination plaintiff could meet his *prima facie* burden by presenting evidence that a younger employee assumed his responsibilities despite his employer's earlier decision not to replace him; a plaintiff could make out a *prima facie* case "even without demonstrating that employees outside of the relevant class were treated more favorably;" or a plaintiff could meet her *prima facie* burden by demonstrating any circumstances that would give rise to an inference of unlawful discrimination. *Pivirotto*, 191 F.3d at 357 (citations omitted).

This court's analysis of whether or not an inference of discriminatory animus has been raised by an employer's actions is governed by the "central focus" of the *prima facie* case– that

12

is, whether defendant treated plaintiff less favorably than other employees because of her race.

*See Sarullo*, 352 F.3d at 798 (citing *Pivirotto*, 191 F.3d at 352).  In *Sarullo* the plaintiff, a Native

American, brought an action against his former employer, the U.S. Postal Service, alleging

discrimination on the basis of national origin and age.  Plaintiff  had been arrested for dealing

drugs in the workplace, terminated from his position, indicted, tried, and finally released after the

jury could not reach a unanimous verdict.  *Id.* at 792-93.  Following dismissal of the criminal

charges, plaintiff sought reinstatement to his position with the United States Postal Service.  *Id.*

at 793.  Plaintiff's request was denied by William Brown, a district manager, pursuant to the

USPS policy prohibiting the rehiring of employees previously terminated for cause.  *Id.*  Brown

was unaware that plaintiff was Native American and had no knowledge of plaintiff's age.  *Id.*

Nevertheless, plaintiff brought an action against the Postal Service under Title VII and the Age

Discrimination in Employment Act of 1967, 29 U.S.C. § 626 *et seq.* ("ADEA"), alleging

discrimination.

Concluding that Sarullo could "not establish that USPS's failure to rehire him raised an

inference of discriminatory animus," the Third Circuit noted as follows:

> Sarullo's evidence of race discrimination consists solely of his own assertion that he was
> not rehired because he is Native American.  He attempts to support that allegation using
> his own deposition and affidavits suggesting that most of his coworkers and supervisors
> knew that he was Native American and some of them called him derogatory nicknames
> referencing his Native American heritage.  However, he has not claimed that employees
> who are not Native American have been rehired after having criminal charges dismissed.
> Although he need not establish that precise kind of disparate treatment to establish a
> claim of discrimination, he must establish some causal nexus between his membership in
> a protected class and the decision to not rehire him.

*Id.* at 798.

Similarly, in *Bullock v. Children's Hospital of Philadelphia*, an African-American

13

plaintiff brought a Title VII action against her former employer, alleging race discrimination. 71
F. Supp. 2d 482 (E.D. Pa. 1999). Like McCoy, the plaintiff in *Bullock* was terminated after
receiving several opportunities to improve her professional performance. Bullock, employed by
defendant as a secretary, did not meet defendant's expectations in several performance categories
and received a below-average performance rating for 1996. *Id.* at 483-84. She was also given an
oral warning, a 60-day Personal Improvement Plan ("PIP"), and a 30-day grace period during
which to secure employment elsewhere. *Id.* at 484. Like McCoy's Action Plan, the PIP set forth
specific areas in which Bullock was expected to improve. *Id.* When– at the conclusion of the
PIP period– Bullock had failed to perform satisfactorily, she was fired. *Id.* Following her
termination, Bullock's position was filled by an African-American female. *Id.*

Noting that "race discrimination claims require that the Court consider the unique nature
of the circumstances and evidence presented to determine whether there is sufficient evidence to
support an inference of discrimination," the court held that plaintiff failed to establish the fourth
element of her *prima facie* case of discrimination:

> Bullock testified that she believed that [her supervisor] discriminated against her because
> of her race because she could not figure out any other reason that he would have criticized
> her job performance. To make out a prima facie case of discrimination requires more
> than such speculation. Bullock's disagreement with [her supervisor's] assessment of her
> job performance is not sufficient to raise a presumption of discrimination. Furthermore,
> Bullock's assertion that the performance deficiencies noted by [her supervisor] were due
> to the fact that the other secretary, Eldora Hatton (who is also African-American), was
> having performance problems is not evidence that [his] criticisms were motivated by
> racial animus. Although Bullock feels that her termination was unfair and is at a loss to
> explain why [her supervisor] faulted her performance, Bullock has failed to establish by a
> preponderance of the evidence the existence of a prima facie case of discrimination.

*Id.* at 490-91. Like the Third Circuit, the *Bullock* court emphasized that a plaintiff's own
assertion of racial animus does not give rise to an inference of unlawful discrimination. Where a

plaintiff relies upon his own beliefs and testimony as to his own beliefs from his deposition– and fails to present any factual evidence linking his termination to his membership in a protected class– he has failed to make out a *prima facie* case of discrimination.

Like the plaintiffs in *Sarullo* and *Bullock*, McCoy has introduced no evidence– other than her unsupported personal beliefs– demonstrating that the circumstances surrounding her termination give rise to an inference of discrimination.  During her deposition, plaintiff testified concerning several instances of what she perceived to be "hostility" and mistreatment by her supervisors Tracey Sartino and Robin Feller.

Viewing the evidence in the light most favorable to plaintiff, her tenure at Starz included the following incidents: Robin Feller stated to plaintiff, "in the most hostile way [one] can possibly imagine," that plaintiff "cannot do this job;"[12]  to a prospective applicant, Feller asked "could you work for someone like Katrina?  Take a look at her.  Could you work for her?";[13] following a meeting with a client in Boston, Feller said to plaintiff "See, he didn't say anything about you; he said something about Tracey; he didn't say a nice comment about you;"[14]  referring to plaintiff, Feller stated to Tracey Sartino– in plaintiff's presence– "I bet she does not even know how to take notes or remember what happened at the meeting; let's see what she can do;"[15] Sartino "didn't want [plaintiff] sitting next to her" at meals;[16]  Sartino "showed pictures of her

---

[12]McCoy Dep. at 153, ll.1-5.

[13]*Id.* at105, ll.14-15.

[14]*Id.* at 231, ll.12-15.

[15]*Id.* at 232, ll.19-21.

[16]*Id.* at 182, ll.1-6.

wedding to everybody and skipped over [plaintiff] and showed everybody else;"[17] every time plaintiff attempted to utilize additional corporate resources, Sartino "would call [plaintiff] up screaming, hollering at [her] on the telephone, reprimanding [her], treating [her] very hostile and cruel every time [she] made efforts to utilize resources;"[18]  Sartino was "agitated" and "angry" during a business trip with plaintiff;[19] at regional meetings the white female district managers "always clicked together and went together as a group" and plaintiff "was the only one that was not included."[20]

      Even if each of these incidents occurred exactly as described by plaintiff, plaintiff has presented no evidence to suggest that racial bias was the motivating factor behind her supervisors' comments.  While plaintiff labels this work environment as racially discriminatory, she provides no documentary or testimonial evidence linking racial bias to her supervisors' actions.  Plaintiff may have felt excluded by her coworkers or unsupported by her managers; social unpleasantries, however, cannot give rise to an inference of unlawful discrimination where not one single race-based comment is alleged and there is no logical inference that the comments made were, in fact, race-based.

      Where plaintiff does specifically mention race, she notes only that she perceived the unfriendly treatment to have been racially motivated.  For example, plaintiff asserts that defendant's decision not to hire Todd Goldman as a trainer in the Philadelphia office was a

---

[17]*Id.* at 184, ll.1-3.

[18]*Id.* at 132, ll.11-14.

[19]*Id.* at 177, ll.3-16.

[20]*Id.* at 213, ll.1-14.

racially-motivated attempt to sabotage plaintiff's career:

> Q. Do you believe they were racially motivated when they decided not to hire Todd?
> A. I absolutely believe that all of my experiences with Starz Encore was racially motivated, and specifically with Todd Goldman. Yes, I do. [sic].
> Q. What made you believe that the situation with Todd Goldman was racially motivated?
> A. Because of the culture of the company. They did not want me there. I felt like because of my race and my color, they wanted me gone, and they felt that if I– if they put all the burden of doing all the work on me, that I would disappear.
> - - -
> Q. Is there anything specific that you can point to that makes you think the decision not to hire Todd Goldman was racial?
> A. The mere fact that it was not justified for them not to hire him. The only purpose for them not hiring Todd Goldman is so that I can continue having a tremendous amount of work load, more than my white female counterparts, and it was extremely difficult to continue to take on that burden.
> Q. How do you know that was the only reason?
> A. How do I know that was the only reason, it was the only reason. It's the culture of the company.
> - - -
> Q. Is there anything specifically that you can point to that makes you think that Robin or Tracey were motivated by your race when they made the decision not to hire Todd?
> A. Just the hostility, the continual hostility that I experienced, the combative-like environment.

McCoy Dep. at 102, l.24– 105, l.7. Defendant's counsel offered plaintiff multiple opportunities to present evidence– in the form of comments by coworkers, remarks made by supervisors, etc.– that defendant's employment decision with respect to applicant Todd Goldman was racially motivated. Instead, plaintiff offered only her own perceptions concerning the abstract "culture of the company." Similarly, when asked why she was skipped over when Tracey Sartino's wedding pictures were being passed around, plaintiff answered that "[t]hey were Tracey's pictures. I believe that it was the culture of the company that the company typically does not do well with black females. It's a culture thing." McCoy Dep. at 184, ll.18-21. Plaintiff has presented no evidence of this alleged "culture." Such conclusory allegations– which are uncorroborated and

wholly subjective– cannot establish racial discrimination.[21]

Plaintiff also argues that because her position was filled by a white female, her termination gives rise to an inference of discrimination. When plaintiff was hired, she took over certain accounts from Mary O'Connor, a white female, who– although she stayed with Starz–took on new responsibilities as a result of internal reorganization at Starz. McCoy Dep. at 67-70; *see also* Sartino Dep. at 39. Following plaintiff's termination in November, 2000 and defendant's subsequent need to fill the position, Mary O'Connor resumed the responsibilities of Philadelphia District Manager. Sartino Dep. at 143, ll.5-15.

Evidence that a position left vacant by the termination of a minority employee was then filled by a non-minority candidate can raise an inference of discrimination. As the Third Circuit made clear in *Pivirotto*, however, this showing is neither stringently required nor independently sufficient. *See* 191 F.3d at 357. In this case, it is entirely logical and consistent with lawful employment practices for defendant to have turned to Mary O'Connor to assume plaintiff's responsibilities. O'Connor was familiar with both the Boston and New York accounts and was already working out of the Philadelphia office. Furthermore, it was O'Connor who had trained plaintiff in the first place,[22] thus eliminating any need for additional training. And finally,

---

[21]This court also notes that Tracey Sartino and Robin Feller, the supervisors responsible for the allegedly discriminatory comments, are the same two individuals who made the decision to hire plaintiff in the first place. *See* Sartino Dep. at 33, ll. 3-20; p. 36, ll. 9-17. This fact seriously undermines plaintiff's argument that her termination was racially motivated, since any individual biased enough to discriminate would presumably not choose to hire an African-American in the first place.

[22]The parties dispute the extent of this training. While defendant claims that O'Connor prepared for plaintiff "the best transition kit" her director had ever seen, *see* Sartino Dep. at 55, l.23, plaintiff claims that she received only five minutes of very rushed instruction. *See* McCoy Dep. at 69-76. It is undisputed, however, that O'Connor held the position prior to plaintiff and

18

defendant did not hold plaintiff's position open, actively seek applicants, and hire a white female. *See St. Mary's*, 509 U.S. at 506 (fourth element of *prima facie* case established where "the position remained open and was ultimately filled by a white man").  Rather, defendant turned to the very same employee who had previously held responsibility for these tasks.  It seems clear to this court that O'Connor was not asked to take over plaintiff's duties due to O'Connor's race, but, rather, because of her qualifications and experience.  Defendant's decision to fill the vacancy left by plaintiff by assigning her responsibilities to O'Connor cannot, therefore, give rise to an inference of discrimination.[23]

Plaintiff has therefore failed to establish a *prima facie* case of discrimination.  She cannot show that she was terminated in a manner giving rise to an inference of discrimination.  Accordingly, her claim must fail and summary judgment will be granted for the defendant.

**B.    Pretext**

Even if plaintiff had established a *prima facie* case of discrimination, however,[24] defendant has articulated a legitimate and non-discriminatory reason for plaintiff's termination: deficient performance.  As discussed above, *see supra* § III.A.1, it is undisputed that plaintiff

---

therefore it is safe to assume that she was familiar with the accounts, regardless of the extent to which she effectively trained plaintiff.

[23]As noted above, a plaintiff in an employment discrimination action may also satisfy the fourth prong of her *prima facie* case by proving that colleagues outside of the protected class, who were similarly situated to plaintiff, were treated more favorably than she.  As plaintiff points out, however, there are no similarly-situated white district managers at Starz.  Pl.'s Mem. Opposing Def.'s Mot. Summ. J. at 8.

[24]This court notes that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous."  *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

failed to meet at least some performance expectations. *See Rose v. Woolworth Corp.*, 137 F. Supp. 2d 604, 608 (E.D. Pa. 2001) (assuming, without deciding, that an employer's termination of an employee for repeated performance failures is "legitimate" and "non-discriminatory"); *Gutman v. TICO Ins. Co.*, 1998 WL 306502, *4 (E.D. Pa. June 9, 1998) (holding that plaintiff's "unusually poor performance" provided defendant with a "legitimate, non-discriminatory reason for the termination). Accordingly, pursuant to the third step in the *McDonnell Douglas* burden-shifting scheme, the burden then returns to plaintiff to prove that this reason is pretextual. *McDonnell Douglas*, 411 U.S. at 804 (once defendant has articulated a legitimate, non-discriminatory reason for termination, the plaintiff must then come forward with evidence that defendant's stated reason is a pretext for discrimination).

In order to survive summary judgment at this stage, plaintiff may meet her burden of establishing pretext in one of two ways. She must point "to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action" [hereinafter "the *Fuentes* test"]. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) and *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996) (en banc)).

To establish pretext under the first approach, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Id.* (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09

20

(3d Cir. 1997) (en banc)). It is insufficient to show simply that defendant's employment decision was wrong or mistaken, "since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Id.* Plaintiff may, however, establish pretext by introducing evidence that an employer's proffered reason was "not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason." *Id.* (citing *Keller*, 130 F.3d at 1109).

Pursuant to the second approach to proving pretext under the *Fuentes* test, a plaintiff may prove pretext by showing that discrimination was "more likely than not" the motivation behind defendant's actions. *See id.* at 413. In addition to such direct evidence, the Third Circuit has held that a plaintiff may, by way of indirect evidence, "show that the employer has previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Id.* (citing *Simpson v. Kay Jewelers, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998)).

(1) The *Keller* Case

In *Keller*, plaintiff was terminated for failure to meet performance goals. *Keller*, 130 F.3d at 1107. As executive vice president, chief financial officer, and chief credit officer of defendant company Orix Credit Alliance, Keller was responsible for obtaining $1.5 billion in credit facilities beginning in 1989. *Id.* at 1103-04. Despite his thirteen years of experience with Orix, however, Keller failed to secure any increase in bank lines, did not come close to meeting the financing goal, and failed to pursue raising funds by asset-backed securitization, as suggested by his directors. *Id.* at 1104. Orix relieved Keller of his responsibilities as chief credit officer so

21

that he could focus on funding, he was reminded continually by Orix's senior officers and directors of the importance of raising funds, and yet– by the autumn of 1992– defendant's total available bank lines had dropped.  *Id.* at 1104-05.  Keller was terminated in April, 1993, and within one year his replacement– who is approximately five years younger than Keller– had raised well over $1.5 billion in new credit facilities.  *Id.* at 1106-07.  Following his termination, Keller brought an action against Orix alleging age discrimination.  An en banc panel of the Third Circuit, reviewing the district court's grant of summary judgment, considered at length whether Keller had established pretext as required by *McDonnell Douglas*.

Assuming arguendo that steps one and two of the *McDonnell Douglas* scheme had been satisfied, the panel evaluated Keller's attempt to show pretext under the two-part *Fuentes* test.  *Id.* at 1108.  In an attempt to demonstrate that Orix did not have a legitimate reason for terminating him, under the first prong of *Fuentes*, Keller argued that his inability to meet the funding goals was "due to factors beyond his control."  *Id.* at 1109.[25]  The panel noted, however, that Keller's evidence tending to show that his performance was hampered by external factors amounts to little more than a claim that he "did as well as he could" under the circumstances.  *Id.*  The relevant question, however, was "not whether Keller could [or could not] have done better; instead, the relevant question is whether the evidence shows that it was so clear that Keller could

---

[25]These "factors beyond his control" included the following: Keller could not launch a commercial paper program because there were "many obstacles" to obtaining a sufficiently high credit rating; he could not secure bank lines of credit because of the company's credit rating, a general "downturn" in the industry, and defendant's history of untimely payments; he was hindered in raising money because of banks' reluctance to issue loans to Japanese companies in light of the negative economic situation in Japan; the banks he approached had limits on lending to financing companies.  *Keller*, 130 F.3d at 1104.

not have done better that Orix Credit Alliance could not have believed otherwise." *Id.* Noting

that defendant went on to obtain substantial amounts of funding through the very channels that

Keller had failed to pursue– in addition to the fact that Keller's replacement met the $1.5 billion

goal within two years– the Third Circuit held that "Keller has not shown that it was so plain that

he could not have done substantially better under the circumstances that Orix Credit Alliance

could not have truly believed otherwise." *Id.* at 1110.[26]

    Under the second prong of the *Fuentes* test, Keller offered evidence intended to

demonstrate that discrimination was more likely than not a determinative cause of his

termination. This evidence consisted primarily of a comment made to Keller, by Orix president

Daniel Ryan, that if Keller was "getting too old for the job, maybe [he] should hire one or two

young bankers." *Id.* at 1111. Despite the fact that these "alleged words certainly constitute

evidence from which a reasonable factfinder could draw an inference of age-based animus," the

Third Circuit held that this comment alone could not "reasonably be viewed as sufficient to prove

by a preponderance of the evidence that age was a determinative cause of Keller's subsequent

termination." *Id.* at 1112.[27] Moreover, the panel emphasized that Orix had a "powerful,

legitimate reason for discharging Keller." *Id.* at 1113. Noting that Keller was replaced by a man

---

[26]The panel also rejected Keller's argument that he had presented evidence showing that his directors "knew that [he] could not have done appreciably better under the business circumstances" at Orix. *Keller*, 130 F.3d at 1110.

[27]The court also noted that "the alleged statement pertained to only one method of raising funds– obtaining lines of credit from banks outside New York City by traveling to meet their officers. Even if Ryan's alleged statement is interpreted to mean that he felt that Keller might be getting too old to do the traveling necessary to raise funds in this way, no evidence has been brought to our attention that other methods of raising funds, such as beginning a commercial paper program or utilizing asset-backed securitization, would have required extensive travel." *Keller*, 130 F.3d at 1112.

23

fewer than five years his junior, that Keller had failed to "meet or even approach the critical $1.5 billion goal," and that a reasonable factfinder could have concluded that Orix "was more likely to be concerned about Keller's [business] failure" than about replacing him with a slightly younger man, the panel held that Keller did not introduce evidence sufficient to allow a reasonable factfinder to conclude, by a preponderance of the evidence, that age was a determinative factor in his termination. *Id.*

(2) Plaintiff's Case

It is obvious from the record in this case that plaintiff has failed to establish pretext via either of the methods set forth in the *Fuentes* test. She admits to her own deficient performance in certain areas, thus undermining any argument that defendant's decision to terminate her was "so plainly wrong that it cannot have been [its] real reason." At most, plaintiff disputes the bases for her Action Plan, CDM, and ultimate termination, contending that she could not have reasonably accomplished these objectives without additional support from Starz. More specifically, plaintiff believes that it was "humanly impossible" for her to have completed the goals set forth in the Action Plan because she was "working alone." McCoy Dep. at 247; *see also id.* at 256-57 ("Yes, I did [work hard], but I'm only one person, and I could not realistically– it's inhuman to try and achieve those along with my other responsibilities without any support"). This line of reasoning, however, is insufficient to defeat summary judgment.

Furthermore, plaintiff's attempts to satisfy the second prong of *Fuentes* by presenting evidence that she was treated hostilely cannot permit a reasonable factfinder to conclude– by a preponderance of the evidence– that race was a determinative factor in plaintiff's termination.

24

a.) The First Prong of *Fuentes*

Like Keller, McCoy has attempted to satisfy the first prong of the *Fuentes* test by

demonstrating that despite her deficient performance, such deficiency was not her fault.  In

essence, she claims that she could not have performed any better due to the lack of support

provided to her at Starz.  As the Third Circuit panel in *Keller* made clear, however, whether or

not McCoy "could have done better" has little to do with this court's inquiry; rather, "the relevant

question is whether the evidence shows that it was so clear that Keller could not have done better

that Orix Credit Alliance could not have believed otherwise."  *Id.* at 1109.  Despite the fact that

plaintiff had fewer support staff[28] and less training,[29] she nevertheless failed to complete the goals

set for her by her supervisors.  While defendant takes issue with defendant's basis for her Action

Plan, CDM, and ultimate termination, her argument rests on the assertion that she could not have

performed any better under the circumstances.  According to the Third Circuit in *Keller*,

---

[28]Plaintiff relies heavily upon the fact that she did not have two "trainers" to assist her in her role as district manager.  According to plaintiff, each district manager was assigned two trainers who performed the product knowledge training sessions in the field.  McCoy Dep. at 9, 67.  Plaintiff, however, did not have two trainers working for her at all times during her employment with Starz.  Initially, she had one experienced trainer, Anne Dianna, and one vacant position; a few months into plaintiff's employment, Melissa Diehlman was hired as plaintiff's second trainer.  *Id.* at 23, 29-31, 89.  Anne Dianna left the company on May 5, 2000, and Melissa Diehlman left the company sometime thereafter, due to an emotional breakdown, leaving plaintiff with two vacant positions.  *Id.* at 61, 87.

Defendant does not dispute that plaintiff had two vacant trainer positions for a portion of her employment.  In fact, hiring "two new trainers" was a specific directive contained in plaintiff's Action Plan.  *See* Action Plan.  While the precise dates of– and reasons for– these vacancies are disputed, this court will assume for the purposes of summary judgment that plaintiff did not– for several months of her employment– enjoy the benefits of a full support staff.  This court also notes, however, that defendant was interviewing candidates for these positions and, ultimately, hired two new trainers in November, 2000.  *See* McCoy Dep. at Ex. 1.

[29]While defendant disputes the extent of plaintiff's training, I will view all facts in the light most favorable to plaintiff for the purposes of summary judgment.

however, this line of reasoning is insufficient to establish pretext. Even if plaintiff's performance

deficiencies were fully attributable to circumstances beyond her control, the fact remains that she

did not respond successfully to either of the two attempts made by her employer to set objectives

for her, point out her weak spots, and encourage her to make progress in the right direction.

Defendant's decision to terminate her, therefore, cannot be said to be "so plainly wrong that it

cannot have been the employer's real reason," as required to establish pretext.[30]  *Keller*, 130 F.3d

at 1109.

### b.) The Second Prong of *Fuentes*

Under the second prong of the *Fuentes* test, plaintiff may establish pretext through

evidence that race-based discrimination was "more likely than not" the motivating factor behind

defendant's decision to terminate her.  *Id.* at 1111.  In order to satisfy her burden of proof,

---

[30]Moreover, this court is mindful of the principle that an employer is free to make subjective business decisions so long as they are not discriminatory.  While plaintiff contends that summary judgment is inappropriate because defendant's conclusion that her performance was deficient was based upon "subjective criteria," rather than objective criteria, *see* Pl.'s Memo. Opposing Def.'s Mot. Summ. J. at 11-12, her argument misstates the law.  The Third Circuit has made clear that district courts are not to sit as "members of an employer's promotion board," reviewing an employee's subjective qualities.  *Ezold v. Wolf, Block, Schorr, & Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992).  To the contrary, those decisions are left to management.  Moreover, barring evidence of discrimination, "a company has the right to make business judgments on employee status, particularly when the decision involves subjective factors deemed essential to certain positions....A plaintiff has the burden of casting doubt on an employer's articulated reasons for an employment decision.  Without some evidence to cast this doubt, this Court will not interfere in an otherwise valid management decision."  *Id.* (quoting *Billet v. CIGNA Corp.*, 940 F.2d 812, 825-28 (3d Cir. 1991)).  Defendant's multiple evaluations of plaintiff, therefore– which include both subjective and objective factors– are valid management decisions which this court will disturb only upon a showing, by plaintiff, that defendant's reasons were merely pretextual.  The fact that defendant's evaluations involved certain arguably "subjective" criteria, however, does not preclude summary judgment.

McCoy "must point to evidence that proves [race] discrimination in the same way that critical facts are generally proved– based solely on the natural probative force of the evidence." *Id.* Alternatively, she may rely upon indirect evidence. After a thorough consideration of all the evidence cited by plaintiff, this court can find nothing that would enable a reasonable factfinder to find that racial discrimination was a motivating cause of her termination.

### *(i) Direct Evidence of Pretext*

Where Keller pointed to a specifically age-related comment, which– notably– was nonetheless insufficient to establish pretext, McCoy can point to nothing of the sort. In her opposition brief, she argues as follows:

> As early as January, 2000, Plaintiff believes Defendant showed its racial animus when Plaintiff was scheduled to go to Boston with Sartino to meet the client, and Sartino failed to show up. McCoy did not have a rental car and was expected to take the client to lunch. Sartino failed to even call McCoy. McCoy called Sartino who never provided a reason for her failure to show. Sartino did not provide an apology to McCoy nor an explanation. Rather than cancel the meeting, Sartino left McCoy to handle it herself....Boston is a key account for Starz. McCoy had no information with her; Sartino had it.

Pl.'s Memo. Opposing Def.'s Mot. Summ. J. at 14-15 (citations omitted). Despite plaintiff's contention that the January 2000 incident constituted evidence of racial animus, her account of the meeting includes not one reference to race. Not only does this narrative contain no reference to race and no probative force with respect to whether or not racial discrimination motivated defendant's decision to terminate plaintiff, it does not even raise an inference of discrimination. This is simply not the type of probative evidence that can establish discrimination, let alone with the conclusiveness required to undermine defendant's proffered legitimate reasons.

Similarly, plaintiff argues– with respect to defendant's decision not to hire Todd

27

Goldman as plaintiff's trainer– that "[p]laintiff believes this decision by her management team to not hire Goldman was racially motivated inasmuch as she was drowning in work, and doing more work than her white counterparts." *Id.* at 12.  Other than plaintiff's mention of race, however, there is no evidence that defendant's decision-making process concerning the hiring of trainers and support staff had anything to do with plaintiff's race.[31]

Plaintiff follows up these narratives with similar accounts of perceived hostility in the workplace. *See id.* at 15.  Not one of these arguments, however, includes anything but plaintiff's uncorroborated assertions that race was a factor in her termination.  If true– that is, even if her co-workers were unfriendly, her supervisors unsupportive, and her training incomplete– this evidence establishes nothing with respect to race.  To establish that an employer's adverse employment decision was likely motivated by race requires some affirmative evidence, of which plaintiff offers none.  Instead, she offers her own unsupported and vague assertions about the "culture of the company," which this court finds unpersuasive.  Again, even accepting as true for purposes of this motion that plaintiff perceived an anti-black culture to be prevalent at Starz, plaintiff's perceptions, without more, cannot establish that race was the motivating factor behind her termination.  *See Billet v. CIGNA Corp.*, 940 F.2d 812, 816 (3d Cir. 1991) *overruled in part*

---

[31]More specifically, plaintiff claimed in her deposition that defendant's failure to hire Todd Goldman was racially-motivated "sabotage."  McCoy Dep. at 102, ll.14 - 103, l.5.  Because she points to no evidence linking the alleged "sabotage" to race, however– other than her perception of the "culture of the company"– I need not consider this argument at length.  As discussed *supra*, in §III.A.2, these conclusory allegations do not suffice to establish an inference of discrimination, as required for plaintiff's *prima facie* case.  Where plaintiff has failed to demonstrate an inference of discrimination, the same deposition testimony cannot be relied upon to establish, affirmatively, that discrimination was more likely than not a motivating factor underlying plaintiff's termination.

*on other grounds by St. Mary's*, 509 U.S. at 503 (holding that plaintiff's unsupported allegation

that defendant's employment decision was motivation by discrimination "does not make it so").

Moreover, this court is mindful of the fact that defendant, like the defendant in *Keller*, had a

legitimate reason for terminating plaintiff's employment.  A reasonable factfinder would be

unable, therefore, to find that race– of which there is no evidence– rather than deficient

performance– of which there is substantial evidence– motivated defendant's decision.

### (ii) Circumstantial Evidence of Pretext

Furthermore, plaintiff has not shown– through indirect evidence– that she was

discriminated against by defendant on previous occasions, that other African-American females

were discriminated against, or that similarly-situated Starz employees <u>not</u> within the protected

class were treated more favorably.  *See Jones*, 198 F.3d at 413 (citing *Simpson*, 142 F.3d at 645).

Although plaintiff alleges that she was mistreated prior to her termination, her evidence in

support of this contention– that her supervisors were cruel and hostile– is unavailing to show

pretext for the same reasons that such evidence does not give rise to an inference of

discrimination.  *See supra* § III.A.2.

Nor can plaintiff show that defendant discriminated against other African-American

females.  Despite her testimony that Starz "typically does not do well with black females.  It's a

culture thing," plaintiff offers no evidence that any African-American female was terminated,

demoted, or otherwise mistreated because of race.  With respect to Susan Lewis, an African-

American Regional Vice-President who plaintiff alleges was terminated, plaintiff can provide no

facts in support of her claim regarding Starz's "culture":

Q. If [Susan Lewis] was terminated, do you know why?

A. Because of her race. I would say that Susan was terminated because of her race.

Q. Do you have any firsthand knowledge of the circumstances of her leaving the company?

A. I don't have any– I was not employed at the company upon Susan Lewis's termination. I believe Susan Lewis was terminated one or two months after my termination.

Q. How do you know that?

A. That's one of the things that I was told.

Q. Has anyone ever told you the circumstances of her leaving, specifically?

A. No.

Q. Do you know of any problems that she had at the time she left, problems with the company or that the company had with her?

A. No.

**** 

Q. In fact, while you were there, Susan was a director in the Philadelphia office and then was promoted to vice president?

A. That's correct.

Q. Why do you think they would promote her to an officer position if they were biased against her because of her race?

A. ...I think out of desperation of needing to fill the position...

**** 

Q. Yes. I'm wondering why you think they were desperate to fill the position, so desperate that they promoted an African-American?

A. She was the director. She worked directly with Miles McNamee. I believe that it would be a racial decision not to promote her, if they did not promote her to that position.

Q. But they did, right?

A. And they terminated her, as well. She was there for a short period of time, which is the culture of the company to keep blacks in the company for a short period of time and then terminate them. So they were consistent.

McCoy Dep. at 110, l.15– 113, l.6. Plaintiff's own testimony makes clear that she has no

foundation whatsoever– no personal knowledge, no detailed facts, and no additional witnesses–

for her claim that Susan Lewis was terminated. Her suggestion that such termination was racially

motivated is mere speculation.  Because summary judgment must be based upon admissible

evidence, *see* Fed. R. Civ. P. 56(e), I will not rely upon such speculation.

More to the point, Susan Lewis testified that she was not, in fact, terminated from Starz at

all, but that her departure from Starz was a decision she made mutually, with Starz.  Lewis Dep.

at 12 (attached to Pl.'s Mem. as Ex. E); *see also id.* at 16 (Q: So, in fact, if someone had said that

you were involuntarily terminated by Starz, that would be incorrect?  A: Yes").  Lewis stated that

as the size of her client grew, "the needs of the division didn't match my career direction, as well

as it wasn't really playing to my performance strength."  *Id.* at 12.  In February 2001, therefore,

she left Starz.  *Id.* at 9.  When asked specifically whether or not she "believe[d] that Katrina

McCoy was treated badly on the basis of her race," Lewis responded "[n]o."  *Id.* at 36.

Similarly, plaintiff's claim that Dee Filey Davis and Lee Gashmaxey, two African-

American women employed by Starz, experienced race-based discrimination is not supported by

any evidence.  Plaintiff has not presented this court with the deposition testimony of either of

these women.  Moreover, this claim is undermined altogether by plaintiff's testimony that "by the

way, I don't know either one of those ladies."  *Id.* at 296, ll.22-23.[32]  And finally, plaintiff's

---

[32]Plaintiff's assertion that she does not know either Davis or Gashmaxey is confusing in light of the fact that moments earlier in her deposition she had recounted, in detail, these two women's views concerning the racial climate at Starz.  For example, plaintiff testified that Davis told her that she "had the exact same experience when she was communicating all the issues and concerns."  McCoy Dep. at 295, ll.9-11.  Plaintiff also testified that Gashmaxey "expressed to me that she prayed to God that he take her out of [Starz] because of the racial climate and that she was blessed to have been able to get out of there," and that "[Gashmaxey] talked about all the issues and all the racial problems that they had in the company."  *Id.* at 296, ll.7-12.  While evidence of a pattern of racial discrimination at Starz could certainly assist plaintiff in her attempts to prove pretext, the inconsistent nature of this testimony– that is, plaintiff's statements about what Davis and Gashmaxey thought and felt about the racial climate at Starz, followed by the disclaimer that she does not know either individual– without more, cannot support a finding

testimony as to the beliefs and perceptions of two other women is hearsay and therefore would be inadmissible at trial.  *See* Fed. R. Evid. 802.  Because summary judgment must be based upon admissible evidence, *see* Fed. R. Civ. P. 56(e),  I cannot consider these statements.  Accordingly, plaintiff has not shown that defendant discriminated against other African-American females.

Finally, as discussed above, plaintiff cannot demonstrate that similarly situated employees were treated more favorably because plaintiff acknowledges that no such similarly situated employees exist.  *See supra* note 19.

Plaintiff has failed to produce evidence that plaintiff's decision to terminate her was "so plainly wrong" that it was necessarily a pretext for discriminatory animus.  She has also failed to prove, through either circumstantial or direct evidence, that racial discrimination was "more likely than not" the motivating factor behind her discharge.  Consequently, a reasonable factfinder could not find, by a preponderance of the evidence, that plaintiff has established pretext.

## Conclusion

Plaintiff has failed to make out a *prima facie* case of discrimination because she cannot demonstrate that the circumstances surrounding her termination give rise to an inference of unlawful discrimination. Even if plaintiff had made out a *prima facie* case, however, she cannot survive summary judgment because she has failed to establish pretext pursuant to the *Fuentes*

---

of pretext.  Plaintiff has failed to point this court's attention to any additional evidence, in the form of corroborative testimony from other witnesses, documents, etc., that supports her contention that two other African-American women, whom she did not even know, perceived Starz to be a racially hostile working environment.

test.  Accordingly, summary judgment will be entered for the defendant.  An appropriate order

follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATRINA WILLIAMS-McCOY, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| STARZ  ENCORE GROUP | : | NO. 02-5125 |
| a/k/a ENCORE MEDIA COMPANY, | : | |
| Defendant. | : | |

## Order

YOHN, J.

        And now, on this _____ day of February 2004, upon consideration of defendant's

motion for summary judgment, (Doc. #16), plaintiff's opposition thereto and memorandum of

law in support thereof, and defendant's reply, it is hereby ORDERED that defendant's motion for

summary judgment is GRANTED and judgment is entered in favor of Defendant Starz Encore

Group, a/k/a Encore Media Company, and against plaintiff Katrina Williams-McCoy.


                                        _____

                                        William H. Yohn, Jr., J.